COMMONWEALTH vs. ROOSEVELT JEFFERSON.

No. 93-P-84.

Suffolk. April 11, 1994. - June 21, 1994.

Present: DREBEN, KAPLAN, & LAURENCE, JJ.

*Homicide. Self-Defense. Practice, Criminal,* Instructions to jury, View. *Words,* "Dwelling."

At a murder trial in which the judge instructed fully on self-defense there was no error in his declining to instruct in accordance with G. L. c. 278, § 8A (self-defense in one's own dwelling), where, in the circumstances of the shooting, which took place in a hallway and not in a dwelling, the statute did not apply. [686-687]

No substantial risk of a miscarriage of justice was created by the judge's instruction to the jury at a criminal trial that they could use their view of the scene of the crime as evidence, inasmuch as photographs of the scene were admitted at trial. [688]

INDICTMENTS found and returned in the Superior Court Department, two on November 20, 1989, and one on November 29, 1989.

The cases were tried before *John J. Irwin, Jr.,* J.

*James L. Sultan* for the defendant.

*Katherine E. McMahon,* Assistant District Attorney, for the Commonwealth.

KAPLAN, J. In early morning of November 11, 1989, the defendant, Roosevelt Jefferson, shot Lester Miller at point blank range with a .38 calibre handgun. Miller died of the wound almost immediately. Upon jury trial, the defendant was convicted of murder in the second degree and of associated firearms violations. The defendant appeals. We affirm.

The story, reconstructed from the defendant's own testimony, ran as follows. Shortly after midnight, November 10, the defendant and two women, Charlotte Beasley (Miller's girlfriend, then pregnant by him) and Daunne Gonsalves,

were "socializing" in Jefferson's apartment No. 6 at 36 South Huntington Avenue, Boston; they were talking, drinking, and looking at television. Miller came down the hallway to the closed door of the apartment and knocked loudly on it. After some palaver, the defendant let Miller in. The men were well known to each other. Miller, thirty years old, muscular, unarmed, and very drunk,[1] began abusing the defendant, aged fifty-nine and somewhat infirm: "You old gray-assed motherfucker, I'm going to kill you." The defendant, protesting that the noise would get him put out of his apartment, asked Miller to cool down. Miller left the apartment, but remained outside in the hallway, and started again to pound on the door. The defendant opened the door and expostulated with Miller, who repeated his abusive refrain. As the defendant tried several times to close the door, Miller put his foot in the way. Then he grabbed the defendant and Beasley, who was also at the doorway, and slammed them against the wall opposite the doorway.

As the two came back into the apartment, Miller began again beating on the closed door. The defendant, taking a kitchen knife, opened the door and renewed talking with Miller; again Miller put his foot to the door when the defendant sought to close it.

Finally, with the door closed, the defendant threw down the knife and took the .38 gun from the top of the refrigerator next to the door. Holding the gun at his side where Miller would not see it, he opened the door. He says Miller made a move toward him with his left shoulder; they tussled a bit, and as Miller swung around, the gun fired. The defendant says he intended to hit Miller but not to kill him. He insisted that he was concerned about losing his apartment because of the disturbance Miller was causing, and he feared also for his safety. We need add here that the autopsy report found that the gun at the moment it fired was held to Miller's left forehead, creating a characteristic "stellate" wound; the bul-

---

[1]According to the autopsy report, Miller's blood ethanol content was .19 percent, the equivalent of the consumption of twelve ounces of straight whiskey in a short period of time.

let's trajectory was at an upward angle and lodged in the wall opposite about six feet, two inches from the floor. Miller's height was five feet, eight inches. Miller's body lay wholly in the hallway. The episode from the time of Miller's appearance took about fifteen to twenty minutes.

To resume with the defendant, he promptly quit the apartment, entered his car parked outside, placing the .38 under the passenger seat. After a brief stop at his girlfriend's house, he drove to the District 2, Roxbury, police station, and spoke to the officers there. Retrieved from the car was a .22 calibre weapon; the defendant denied ownership. The defendant did not explain how the substitution had occurred.

1. Although the evidence that could create a basis for a jury instruction on self-defense by means of deadly force was quite slim,[2] the judge did instruct fully on self-defense in the customary approved way. The defendant complains, however, that the judge did not superadd a charge under the "castle" statute, G. L. c. 278, § 8A, set out in the margin.[3] This would have told the jury that where an occupant of a dwelling is charged with killing one unlawfully in the dwelling, he may defend on the ground that he acted in the reasonable belief that the intruder was about to inflict great bodily injury upon him and that he used reasonable means to defend himself; and — here is the "castle" point — "There shall be no duty on said occupant to retreat from such person unlawfully in said dwelling." The defendant's request for instructions did not refer in terms to the statute, and any inferential reference is rather hard to discern, but the judge may be taken to have considered a § 8A instruction and declined it.

---

[2]See note 6, *infra*.

[3]General Laws c. 278, § 8A, as inserted by St. 1981, c. 696: "In the prosecution of a person who is an occupant of a dwelling charged with killing or injuring one who was unlawfully in said dwelling, it shall be a defense that the occupant was in his dwelling at the time of the offense and that he acted in the reasonable belief that the person unlawfully in said dwelling was about to inflict great bodily injury or death upon said occupant or upon another person lawfully in said dwelling, and that said occupant used reasonable means to defend himself or such other person lawfully in said dwelling. There shall be no duty on said occupant to retreat from such person unlawfully in said dwelling."

The negative ruling was justified. *First*, the "dwelling" was the apartment itself. It did not comprise the nonexclusive hallway or corridor outside the apartment. This is made clear in *Commonwealth* v. *Albert*, 391 Mass. 853, 861-862 (1984), interpreting the statute. The fatal shooting here did not occur in the apartment but entirely in the hallway. The statute did not apply. The defendant, indeed, himself indicated that the victim had not been interested in getting inside the apartment; he wanted to harass the defendant from without: "I don't think he really tried to come in after he had been in, I think. He just wanted to harass me to death."[4] *Second*, at all events, for the statute to have any realistic application, to be of any help to a defendant, there must have been space in which the defendant could retreat. Here there was none, for the apartment was very small and cluttered, and there was no backdoor, no feasible means of retreat.[5] In this situation, the full conventional instruction regarding self-defense gave the defendant all necessary protection.

We note, additionally, as we intimated at the beginning of this point 1, that a predicate of § 8A, namely, that a defendant (occupant) believe reasonably that he was threatened with serious bodily injury or death, was at the vanishing point here.[6] The defendant's § 8A argument is artificial and should not succeed.

---

[4]Beasley's testimony was also to the effect that Miller was not in the apartment but in the hallway when he was shot. In Beasley's version, the defendant approached Miller holding the gun behind his back; he said, "I told you to get away from my door or you're going to suffer the consequences"; Miller said, "Take your best shot"; the defendant fired twice. (Beasley added the touch that during the socializing the defendant asked if she was "still having babies by that no-good motherfucker.")

Gonsalves did not offer anything about the final confrontation because she was (conveniently) in the bathroom of the apartment, with the door locked, when it took place. (Gonsalves testified that Miller had shouted earlier, "Tell the bitch to come out," meaning Beasley.)

[5]Compare the circumstances, layouts, and possibilities of retreat in the triad of decisions that led to the enactment of G. L. c. 278, § 8A: *Commonwealth* v. *Shaffer*, 367 Mass. 508 (1975); *Commonwealth* v. *Barton*, 367 Mass. 515 (1975); *Commonwealth* v. *Gagne*, 367 Mass. 519 (1975).

[6]Miller was not armed. The defendant's reference to Miller's movement with his left shoulder and, vaguely, to something at Miller's side, hardly

2. The jury took a view of the apartment and environs. In his statement before the view was undertaken, and again in his final instructions, the judge said that the jury could use the view as evidence and give it what weight they thought appropriate. This was technically incorrect; information acquired at a view is not evidence in a strict and narrow sense but may be used by the jury in reaching a verdict. See Liacos, Massachusetts Evidence § 11.9, at 670 (6th ed. 1994). The point is trivial, especially as photographs were admitted at trial. Such error as there was did not create a substantial risk of a miscarriage of justice, the relevant standard, since no objection was taken below.

3. The jury in a communication to the court expressed difficulty in distinguishing second degree murder from manslaughter and requested a definition of manslaughter. In response, the judge chose to define both crimes comparatively. The defendant argues that this would improperly encourage the jurors in the direction of murder. We disagree and again point out that no objection was taken at the time.

*Judgments affirmed.*

---

suggests that the defendant's point-blank shooting was responding to a reasonable apprehension of Miller's inflicting upon him grave bodily harm or death. Gonsalves spoke vaguely of Miller having his hands in his pockets like he had something. According to Gonsalves, the defendant did not take the gun from the refrigerator; rather he entered the bedroom and drew the gun from under a mattress and went back to the doorway. But then she was in the bathroom when the shooting took place.

On this question of the defendant's response by gunfire, the Commonwealth goes further and contends that the jury's finding of second degree murder excludes the existence of a right to resort to deadly force (and also excludes provocation), and so, if there was error in declining a § 8A instruction, it was harmless. We need not press the proposition.