## COMMONWEALTH *vs.* ROBERT E. FORTINI, THIRD.

No. 96-P-2029.

Plymouth. February 13, 1998. - April 8, 1998.

Present: WARNER, C.J., KAPLAN, & GILLERMAN, JJ.

*Evidence,* Collateral matter, Self-defense, State of mind. *Self-Defense. Practice, Criminal,* Instructions to jury.

At a murder trial, error, if any, in the judge's excluding evidence of the victim's threatening and violent conduct, not in the defendant's presence and not directed toward the defendant, proffered by the defendant to bolster his claim that he was defending himself against the victim's aggression, was not prejudicial where that evidence was to some degree merely cumulative and where it could not justify or explain the defendant's waiting on his front porch with a loaded shotgun to confront the victim [566-569]; and the exclusion of the evidence did not interfere with the defendant's assertion of the defense of self-defense [569].

At a murder trial, the judge did not err in admitting evidence of the defendant's racist remarks for the purpose of showing the defendant's state of mind. [569-570]

INDICTMENT found and returned in the Superior Court Department on November 9, 1992.

The case was tried before *Robert L. Steadman,* J.

*Robert L. Sheketoff* for the defendant.

*Mary E. Mullaney,* Assistant District Attorney, for the Commonwealth.

GILLERMAN, J. After seven trial days, the jury returned a verdict of murder in the second degree. The defendant appealed, his principal claim being the judge's denial of his motion in limine.

In his motion in limine, the defendant alleged that about five minutes before the defendant shot the victim, the victim was involved in an episode with other persons that revealed his

disposition to violent and threatening behavior.[1] The defendant did not know of the episode when he shot the victim.

The judge denied the defendant's motion. He ruled that he would admit "any evidence concerning the victim's character as a . . . violent person, if known to the defendant. . . [and] any threats made [by the victim] concerning this defendant, whether he knew of them or did not know of them."

Because the defendant received the benefit of an instruction on self-defense,[2] we look only to the question whether the judge's evidentiary ruling was correct, and if not, whether the exclusion was prejudicial error such that the ruling "weakened the defendant's case in some significant way." *Commonwealth v. Seabrooks*, 425 Mass. 507 (1997); *Commonwealth v. Jenner*, 426 Mass. 163, 165 (1997); *Commonwealth v. Pearce*, 43 Mass. App. Ct. 78, 83 (1997). We summarize the evidence, major features of which are not disputed.

1. *The Commonwealth's case.* The defendant lived in the second-floor apartment at 18 Allerton Street, Plymouth, with his girlfriend, Janice Hall, and her cousin, Tammy Peckham. At the first-floor level, there was a front porch. As one faced the porch, the entrance to the second-floor apartment was on the right; beyond the front door was a stairway leading to the defendant's second floor apartment. There was a doorbell at the front door for the second floor apartment.

Around 5 P.M. on June 22, 1992, and again around 6:20 P.M., the victim came to the defendant's house looking for Peckham. Shortly before 8 P.M., another visitor came to the house looking for Peckham. Both the victim and the second visitor were black men.

---

[1]The defendant relies on *Commonwealth v. Harris*, 409 Mass. 461, 469 (1991) (when the defendant's case is essentially that the victim was the aggressor, relevant evidence of the victim's state of mind may be material to the defense).

[2]"To raise the issue [of self-defense] sufficiently, the evidence viewed in the light most favorable to the defendant must permit a reasonable doubt whether the defendant (1) had reasonable ground to believe and actually did believe that he was in imminent danger of death or serious bodily harm, from which he could save himself only by using deadly force, (2) had availed himself of all proper means to avoid physical combat before resorting to the use of deadly force, and (3) used no more force than was reasonably necessary in all the circumstances of the case." *Commonwealth v. Reed*, 427 Mass. 100, 102-103 (1998). "The Commonwealth has the burden of disproving the factor of self-defense beyond a reasonable doubt." *Id.* at 102.

At about 9 P.M., there was another knock on the defendant's door. The defendant went downstairs to the front door, as he had done earlier, and again he told the visitor, who was later identified as the victim, that Peckham was not there. A short while later, Hall heard a car drive past the defendant's house, and a voice cursing and swearing at the house.[3]

The defendant, who had spent the evening cleaning his shotgun, and Hall went to bed about 11:30 P.M. At about 11:50 P.M. the victim drove past the house, and again there was swearing and cursing.[4] Hall testified that she heard a male voice yelling, "Fuck you. Fuck you, you honky motherfucker. Fuck you, you fucking asshole." According to Hall, the defendant heard the cursing, became agitated, got out of bed, and said, "I'm sick of this . . . I'm sick of these people coming around and I'm going to do something about this." He pulled his shotgun out of the closet, and walked outside, leaving the gun inside. Ten minutes later, he returned, retrieved his gun and five rounds of ammunition, and returned to the porch where he loaded the weapon. At 12:48 A.M., the defendant called the police and reported the profanity and racial slurs he had heard earlier.[5] He told the dispatcher he would watch for a license plate number.

At about 1:15 A.M., the victim and his friend, Dana Lopes, returned to the defendant's house. Lopes was carrying a boom box; it was playing loudly. The hallway light was on, but the exterior light on the porch was off. According to Lopes, who was watching from the sidewalk, the victim started walking up the walkway; he was calm and walking slowly. The victim walked slowly up the steps to the porch and turned to the right. Lopes saw the defendant "stand up with a shotgun." Without a word being said, according to Lopes, the defendant, holding his shotgun at waist-high level, pulled the trigger. The victim fell backwards onto the porch steps, groaned, but never said a word. When a police officer later approached the defendant, the defendant, without any preceding question or comment for the officer, volunteered the statements that he had "shot him. I had

---

[3]Hall heard the words, "Fuck you. Fuck you."

[4]Hall recognized the car as belonging to the victim and told the defendant that she thought it was "those guys that were here earlier."

[5]The tape recording of the conversation has the defendant telling the police, "I'm calling to inform you that twice tonight, once about fifteen minutes ago, a car's driven by my house beeping their horn and yelling out, 'You fucking honkies.' " Later, in a second call to the police, the defendant reported that he had shot someone on his porch.

no choice. He tried to grab the gun and I shot him." When making these statements the defendant was "emotionless, rather calm."

Expert testimony established that the muzzle of the defendant's shotgun was between three inches and one foot from the victim. The victim was shot in the chest, shredding the victim's heart. He died in approximately five minutes.

Hall testified that about two weeks before this episode, the defendant said that he did not want Peckham's black friends around the house. He described them as "niggers, black trash, scum bags." Peckham testified that the defendant used to say that "all black people are the same. They either carry knives, guns, deal or do crack. They're on welfare." Before the witness was allowed to answer, the judge had given forceful limiting instructions regarding the jury's use of these racial slurs.

Kathy Caruso, the defendant's next door neighbor, testified. At about 1:15 A.M. on June 23, she heard a voice say, "Get the fuck out of here." A second voice responded, "You're a fucking asshole." Then she heard a gunshot.

2. *The defendant's case.* The defendant testified. He corroborated the essential principal features of Hall's testimony. As to the events immediately preceding the shooting, he testified that he went to bed about 11:30 P.M. and was awoken about fifteen minutes later. Someone on the street was leaning on his horn yelling, "Honky motherfucker, fucking honky, we're going to get you." He dressed, went downstairs and went out on the porch. About one-half hour later, he returned to his second-floor apartment and called the police, as described above.

After the telephone call to the police, he got his shotgun and loaded it with ammunition. He felt that he had been "threatened . . . [by] people driv[ing] by [his] house yelling things up. He was worried that he was out there all by [him]self."

With his loaded shotgun in hand, the defendant went downstairs and then took a seat on the porch. He was "just sitting there waiting." The porch light was off so that he could see the street and any number plate. He sat there for about one-half hour. Then he heard two sets of foot steps and a whispered conversation. The footsteps were on the sidewalk, but when he did not see people passing beyond his house he became concerned. Then he heard in a half whisper, "Watch this shit, we're going to wake some motherfuckers up." The defendant was "scared at that point." Then he heard someone come from

around the bushes at the front of the house and mount the stairs to the porch. The defendant did not recognize the victim to be someone he knew.

When the victim got to the top of the stairs, the defendant took a couple of steps forward; his shotgun was in his hand. The defendant, scared, told the victim, "[H]ey, get the fuck out of here." He yelled it as loud as he could. The victim stopped. He stared at the defendant, saw the gun, and centered his attention on the gun. Then at the climactic moment, the victim, according to the defendant, "lunged" at the defendant with his hands outstretched. The defendant was in fear for his life — that the victim would take the gun and shoot the defendant. The defendant took a step backwards, and the victim kept coming at him. As the victim reached for the weapon, the defendant pulled the trigger, and the victim fell backwards and then face down.

The defendant asked the victim if he was "OK," but he received no response. Then the defendant returned upstairs to his apartment and called the police. He told them, "I just shot someone." When the police arrived, he told them, "I had no choice. He was going for the gun."

3. *The excluded evidence.* The proffered evidence, which the judge excluded, would have established the following. Shortly before the shooting, the victim and Lopes were in a car next to a basketball court where several men were playing basketball. The victim ran onto the court and said, "Who wants me?" Then he struck two of the players in the face and attempted to strike a third man. Then he struck a friend of Lopes, and when Lopes remonstrated, the victim said, "I don't care. I'll kill them all. Remember my face. I'm Ceasar Monterio. I'm the baddest motherfucker in town."

From there, Lopes and the victim walked directly to the house where the victim lived — a matter of about five minutes. They passed the home of a Federal police officer, who was awakened by a boom box. He heard one of the occupants yell, "I'm bad. I'm the baddest motherfucker in the world."

The judge excluded the evidence, presumably because the victim's statements were not explicitly directed to the defendant. See *Commonwealth* v. *Fontes*, 396 Mass. 733, 737 (1986) ("Trial judges can control undue investigation of collateral matters, keeping in mind that the central issue is not what the victim actually did in specific instances, but rather what was in the defendant's mind when he confronted the victim").

In response, the defendant argues that the basketball incident and the shooting incident have a "temporal and schematic nexus" — that the jury could reasonably conclude that the victim's violent emotions displayed at the basketball court were continually erupting that night, the last and final eruption being his assault on the defendant immediately before the shooting. Thus, the judge's ruling "denuded" the defendant of evidence corroborating the defendant's claim that it was the victim who attacked the defendant, and that when assaulted by the victim, the defendant had good reason to believe his life was in danger. See *Commonwealth* v. *Rodriquez*, 418 Mass. 1, 5 (1994). Without this evidence, the argument continues, the defendant's description of the victim's conduct — that the victim "lunged" at the defendant's shotgun — appears inexplicable.[6] See *Commonwealth* v. *Marrero*, 427 Mass. 65, 68 (1998).

We need not decide whether our common law can be extrapolated for the benefit of the defendant, for the difficulty with the defendant's argument lies elsewhere. The judge admitted evidence of cursing at the defendant's house at 9 P.M. and again at 11:50 P.M. Those curses carried an implied threat of violence — evidence of the victim's "state of mind" before the shooting — and were so understood by the defendant. Sensing some measure of danger, he called the police at 12:48 A.M. — *before* the basketball episode — to report the episode. Thus, the excluded evidence was to some degree cumulative of what had preceded it.

But more to the point is the fact that the basketball episode does not explain, much less justify, the defendant taking out his

---

[6]The case most likely to support the defendant's position is *Commonwealth* v. *Rubin*, 318 Mass. 587, 588-589 (1945), cited with approval in *Commonwealth* v. *Fontes*, 396 Mass. 733, 735 (1986). In *Rubin, supra*, the court pointed out that threats against the defendant are unlike the more familiar evidence of self-defense, such as the admissibility of the victim's reputation for violence, if known to the defendant. "A threat is a declaration of purpose, and like other declarations of purpose is evidence that an occurrence that might be in execution of that purpose was in fact in execution thereof." On that basis, then, the jury could conclude that threats against the defendant, even if unknown to the defendant, are admissible "to show that the person hurt or killed was actually attempting to carry out his threat, and that the defendant was in real danger." *Id.* at 589. In this case, it might be said, consistently with *Harris, supra* at note 1, that evidence of episodes involving violent conduct by the victim, when those episodes immediately preceded the event for which the defendant is charged, may be admissible to show that the victim was the aggressor.

shotgun, loading it, proceeding downstairs, and taking a seat on the porch to await his presumed enemies almost an hour *before* the basketball episode and before the victim arrived on the steps to his house.

The point is critical because the defendant's decision to leave the safety of his apartment and proceed to the porch, loaded gun in hand, to await his enemies, was not an act of self-defense. Quite the contrary, it was an act intended deliberately to confront his enemies with superior firepower.

The law question which arises has to do with the defendant's duty to retreat before resorting to the use of deadly force. The enactment of G. L. c. 278, § 8A, modified the common law so that henceforth there would be no obligation on the part of an occupant of a dwelling to retreat if he acts in the reasonable belief that a person unlawfully *in* his dwelling is about to inflict great bodily injury or death upon him. See *Commonwealth* v. *Gregory*, 17 Mass. App. Ct. 651, 652 (1984). That statute is of no help to the defendant, for "a tenant's dwelling cannot reasonably be said to extend beyond his own apartment and perhaps any separate areas subject to his exclusive control." *Commonwealth* v. *Albert*, 391 Mass. 853, 862 (1984). See *Commonwealth* v. *Bennett*, 41 Mass. App. Ct. 920, 921 (1996). The defendant's "dwelling" was the second-floor apartment, and the statute is unavailable.

The common law rule, without regard to § 8A, is stated in *Commonwealth* v. *Shaffer*, 367 Mass. 508 (1975). There, the court said, "the right to use deadly force by way of self-defense is not available to one threatened until he has availed himself of all reasonable and proper means in the circumstance to avoid combat." *Id.* at 511. See *Commonwealth* v. *Epsom*, 399 Mass. 254, 258 (1987) (to raise the issue of self-defense, "there must be evidence that the defendant availed himself of all proper means to avoid physical combat before resorting to the use of deadly force"); *Commonwealth* v. *Reed*, 427 Mass. 100, 102 (1998). In short, except when § 8A is available, there is a duty to retreat — if in the circumstances that is reasonable and proper — before resorting to the use of deadly force, see *Gregory*, 17 Mass. App. Ct. at 652, and the judge so instructed the jury: "The right of self-defense does not accrue until a person has availed himself of all proper means to avoid physical conduct." See *Commonwealth* v. *Glass*, 401 Mass. 799, 808 (1988); *Commonwealth* v. *Curtis*, 417 Mass. 619, 632 (1994).

Putting to one side, for a moment, the obvious question whether there was any justification for the defendant to have left the safety of his apartment to lie in wait, on a darkened porch, for his presumed enemies, the defendant's line of retreat, once he was on the porch, was immediately at hand. Upon hearing the two sets of footsteps and the whispered conversation on the sidewalk in front of his house, the defendant had but to open his front door and walk up to his apartment; that front door was on the right side of the porch near where he had taken his seat. We conclude that the defendant's appearance with a loaded shotgun on the darkened porch, coupled with his decision to eschew any retreat to the safety of his apartment, were deliberate acts of defiance, not defense. Contrast *Commonwealth* v. *Jefferson*, 36 Mass. App. Ct. 684, 687 (1994), where there was "no feasible means of retreat."

In sum, the victim's violence at the basketball court was entirely peripheral to the events that account for his killing. If there was an abuse of discretion, there most certainly was no prejudice to the defendant by the exclusion of the proffered evidence.

The defendant also makes the related argument that the judge erroneously instructed the jury that in order to use deadly force, the victim "must have actually assaulted the defendant, that is, attempted or threatened to kill or [to] do serious bodily harm to the defendant." There was no objection to this portion of the charge, and there was no error. See *Commonwealth* v. *Glass*, 401 Mass. at 808 (self-defense is raised when there has been an overt act against the defendant constituting an assault or threat). See also *Commonwealth* v. *Doucette*, 391 Mass. 443, 453 (1984). It is true, as the defendant suggests, a reasonable but erroneous belief that the defendant was assaulted would entitle the defendant to a self-defense instruction. *Glass* at 808. But the defendant's argument that the denial of his motion in limine made it "virtually impossible" for the defendant to show that the victim attempted to do him bodily harm is belied by the defendant's own testimony (the victim "lunged" for the defendant's shotgun).

Finally, the defendant argues that the judge erroneously permitted the Commonwealth to show that the defendant was a racist, thereby nullifying the defendant's claim that he was attacked by the victim. The judge gave forceful limiting instructions before the evidence came in, and in his final charge to the

jury the judge again, and forcefully, instructed the jury that it was "of great importance" that racial remarks were not admitted to show bad character, or a propensity to commit the crime charged. It was admitted only to show a state of mind. "And it may be that it did not show you a state of mind. That, again, is for you and you alone to decide."

*Judgment affirmed.*