## COMMONWEALTH *vs.* RICHARD C. PIKE.

Hampden. October 5, 1998. - November 19, 1998.

Present (Sitting at Greenfield): WILKINS, C.J., ABRAMS, LYNCH, GREANEY, FRIED, MARSHALL, & IRELAND, JJ.

*Self-Defense. Necessity. Practice, Criminal,* Instructions to jury, Probation, Sentence. *Constitutional Law,* Right to travel, Sentence.

At the trial of an indictment for assault and battery by means of a dangerous weapon, the judge correctly declined to instruct the jury on self-defense, where the evidence did not demonstrate that the defendant was in fear of serious bodily harm or death when he threw a heavy metal object at the victim's head, and where there was no evidence that the defendant used all reasonable avenues of retreat before resorting to the use of deadly force. [397-399]

Evidence at the trial of an indictment for unauthorized use of a motor vehicle did not sufficiently raise the defense of necessity so as to require the judge to instruct the jury on the issue. [400-401]

A condition of probation prohibiting a criminal defendant from entering Massachusetts during his probationary period violated the defendant's constitutional right to interstate travel and was invalid; the matter was remanded for the removal of the offending condition. [401-405]

INDICTMENTS found and returned in the Superior Court Department on October 24, 1996.

The cases were tried before *William H. Welch,* J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Kenneth I. Seiger* for the defendant.

*Marcia B. Julian,* Assistant District Attorney, for the Commonwealth.

FRIED, J. The defendant, Richard C. Pike, was convicted of the lesser offense of unauthorized use of a motor vehicle on an indictment charging armed carjacking, and assault and battery

by means of a dangerous weapon.[1] He was sentenced to a prison term of from six to eight years on the assault and battery conviction as well as a term of two years in a house of correction for the unauthorized use of a motor vehicle. The two-year sentence was suspended, and a probation condition barring the defendant from entering the Commonwealth at any time was imposed. The defendant appeals from his convictions and challenges the constitutionality of the special condition of probation. We transferred his appeal to this court on our own motion. We uphold the defendant's convictions but conclude the probation condition is invalid.

## I

In October, 1996, Frederick Holmes, an off-duty Massachusetts State trooper, was driving his automobile on the Massachusetts Turnpike when he noticed traffic in front of him veering into the passing lane to avoid hitting two men, the defendant and Thomas Cutter, who were hitchhiking along the roadway. According to the defendant, he and Cutter, both residents of New Hampshire, had been traveling on the turnpike when their pickup truck broke down. They removed the truck's radio to prevent it from being stolen, left the truck where it had broken down, and walked along the highway, hoping someone would stop to pick them up.

Because he believed the hitchhikers were a hazard to traffic, Trooper Holmes stopped his car in the breakdown lane and approached the two men on foot. The testimony of Holmes and of the defendant differ sharply regarding what happened next.[2] The evidence viewed in the light most favorable to the defendant suggests the following sequence of events. When Holmes left his car, he approached the two men rapidly, shouting angrily. He came close to the defendant and Cutter, using obscenities and telling them they should not be hitchhiking on the turnpike. The defendant testified that he was scared at this point because Holmes was very close to the defendant, with "spit coming out of his mouth," and because the defendant did not know what Holmes was about to do. According to the defendant, Holmes

---

[1] The defendant was also convicted of the lesser offense of unauthorized use of a motor vehicle on an indictment charging armed robbery. This conviction was dismissed as duplicative.

[2] The defendant was the only defense witness at trial. Cutter, a codefendant, did not testify.

wore civilian clothing and neither identified himself as a police officer nor displayed a badge.

The defendant testified that Holmes then reached back, as if to grab an object or to hit the defendant, so the defendant dropped the truck's radio on the ground and grabbed Holmes by the arms. In the ensuing scuffle, described in more detail below, Holmes flipped the defendant over the guardrail along side the highway and attempted to hold him there. The defendant, however, was able to come back over the guardrail, at which point he picked up the radio and threw it at Holmes, hitting Holmes in the side of the head. Holmes suffered a cut and scrapes on his head and neck resulting from the impact of the radio. The defendant and Cutter then got into Holmes's automobile, which was parked in the breakdown lane with the keys still in the ignition, and drove down the turnpike before abandoning the automobile in a restaurant parking lot and boarding a bus back to New Hampshire.

## II

The defendant claims that the trial judge erred in refusing to instruct the jury on self-defense. A defendant is entitled to a self-defense instruction if any view of the evidence would support a reasonable doubt as to whether the prerequisites of self-defense were present. See *Commonwealth* v. *Harrington*, 379 Mass. 446, 450 (1980); *Commonwealth* v. *Monico*, 373 Mass. 298, 299 (1977). If, however, the evidence was insufficient to allow a reasonable doubt to be raised, no self-defense instruction would be necessary. See *Commonwealth* v. *Maguire*, 375 Mass. 768, 772 (1978). In determining whether sufficient evidence of self-defense exists, all reasonable inferences should be resolved in favor of the defendant, and, no matter how incredible his testimony, that testimony must be treated as true. See *Commonwealth* v. *Vanderpool*, 367 Mass. 743, 746 (1975).

The proper standard for determining whether a defendant's particular actions were justifiably undertaken in self-defense depends on the level of force he used on his victim and the circumstances that prompted those actions. The right to use nondeadly force arises at a "somewhat lower level of danger" than the right to use deadly force. *Commonwealth* v. *Baseler*, 419 Mass. 500, 502-503 (1995), quoting *Commonwealth* v. *Bastarache*, 382 Mass. 86, 105 (1980). In this case, the defendant was charged with assault and battery by means of a

dangerous weapon. Whatever the judgment might be about the reasonableness of the defendant's initial grabbing of Holmes, it is the later throwing of the radio at Holmes that is the basis of this charge. The standard for self-defense by deadly force should be applied, even though death did not result.[3] See *Baseler, supra* at 502-503; *Bastarache, supra* at 105 & n.15; *Commonwealth* v. *Houston,* 332 Mass. 687, 690 (1955) ("In order to create a right to defend oneself with a dangerous weapon likely to cause serious injury or death, it must appear that the person using the weapon had a reasonable apprehension of great bodily harm and a reasonable belief that no other means would suffice to prevent such harm").

Given this standard, it follows that a self-defense instruction must be given when deadly force was used only if the evidence, viewed in the light most favorable to the defendant, permits at least a reasonable doubt that the defendant reasonably and actually believed that he was in "imminent danger of death or serious bodily harm, from which he could save himself only by using deadly force." *Commonwealth* v. *Harrington,* 379 Mass. 446, 450 (1980). See *Commonwealth* v. *Reed,* 427 Mass. 100, 103 (1998) (merely being afraid is not sufficient); *Commonwealth* v. *Barros,* 425 Mass. 572, 576 (1997); *Houston, supra* at 690. For such a belief to be reasonable, the victim must have committed some overt act against the defendant. If an assault includes the threat of an action that would cause the defendant serious bodily injury, this is sufficient to require such an instruction. Self-defense using deadly force is not justified in the absence of such a threat. See *Commonwealth* v. *Taylor,* 32 Mass. App. Ct. 570, 578 (1992) (victim's possession of gun did not justify defendant's actions, claimed to be done in self-defense, in absence of evidence that victim overtly threatened defendant with gun). See also *Commonwealth* v. *Glass,* 401 Mass. 799, 808 (1988); *Commonwealth* v. *Doucette,* 391 Mass. 443, 453-454 (1984).

If the defendant's apprehension of grievous bodily harm or death, though mistaken, was reasonable, his actions in self-defense may be justifiable. See *Glass, supra* at 808; *Com-*

---

[3]The relevant inquiry is what level of force was used, not what the resulting injuries were. If, for example, the use of force generally considered nondeadly results in death in a particular case, an appropriate jury charge would recite the standard for use of nondeadly force. See *Commonwealth* v. *Bastarache,* 382 Mass. 86, 105 & n.15 (1980).

monwealth v. *Barber*, 394 Mass. 1013, 1013 (1985). Cf. *Commonwealth* v. *Naylor*, 407 Mass. 333 (1990) (Commonwealth conceded that the defendant's belief that he was in danger, although mistaken, was reasonable). Thus, although there is no evidence that Holmes intended to injure the defendant, and although the evidence suggests that Holmes, a law enforcement officer, approached the defendant not intending to cause him serious bodily harm, the defendant may have been entitled to a self-defense instruction if he reasonably believed that Holmes meant to injure him seriously.

According to the defendant's testimony, the scuffle between the defendant and Holmes progressed in two stages. In the first, the two men wrestled in the breakdown lane, Holmes eventually flipping the defendant over the guardrail along side the highway. Holmes held the defendant to the ground on the other side of the guardrail, tearing the defendant's shirt and pulling his hair. After a few moments, Holmes let go of the defendant and retreated "a little way away" from the defendant. The second stage of the altercation involved the defendant's use of the radio as a weapon. The defendant testified that, after Holmes let go of him, the defendant "came back over the guardrail." He saw Holmes "coming towards" him, and he picked up the radio from the pavement and threw it at Holmes, striking Holmes in the head.

The evidence suggests that the defendant initially assaulted Holmes because the defendant saw Holmes reach behind his back and that the defendant grabbed Holmes's arms to prevent Holmes from attacking him. Whether the defendant's fear of attack was reasonable is a factual question, depending upon a number of circumstances, such as whether the victim was armed and the physical size of the victim, see *Commonwealth* v. *Rubin*, 318 Mass. 587, 590 (1945), and is ordinarily to be determined by the jury. We need not reach that question here. Because the defendant was convicted of assault by means of a dangerous weapon, the crucial inquiry is not whether the defendant was justified in grabbing or striking Holmes in the first stage of the fight, but whether he was justified in later throwing the radio at Holmes. The evidence does not support the defendant's self-defense theory in this regard.

With respect to the beginning of the second part of the interaction — when the defendant climbed back onto the roadway — the defendant did not testify that he feared, at that

moment, that Holmes was about to inflict serious injury on him. Rather, he stated, "[Holmes] was coming towards me and I just, fuck you, he already grabbed me by my hair and ripped the shirt off. I picked the radio up and threw it." This testimony indicates that the defendant threw the radio at Holmes out of a feeling of anger or revenge resulting from the first stage of the altercation. It does not support at all the contention that he acted out of fear of "imminent danger of death or serious bodily harm, from which he could save himself only by using deadly force." *Barros, supra* at 576. The defendant argues on appeal that he threw the radio because Holmes was "rushing" him in an "obvious attempt to further subdue" him. But at trial, the defendant stated merely that Holmes was moving toward him from a distance of from five to seven feet.

He later testified that he threw the radio at Holmes, hitting him in the side of the head. The defendant testified that he never saw Holmes with a weapon, and there was no evidence that Holmes had a means of injuring the defendant from a distance of several feet. These facts do not support a contention that the defendant feared that he was in imminent danger of serious bodily harm or death, avoidable only by throwing a heavy, metal object at Holmes's head. Accordingly, there was no basis for requiring the judge to submit to the jury the defendant's theory of self-defense where the self-defense included the use of deadly force.

The defendant's self-defense theory is meritless for the further reason that there was no evidence that he attempted to avoid further physical combat, nor that he was unable to do so. A self-defense instruction is not required unless there is some evidence that the defendant availed himself of all means, proper and reasonable under the circumstances, of retreating from the conflict before resorting to the use of deadly force. See *Commonwealth* v. *Niemic*, 427 Mass. 718, 722 (1998); *Harrington, supra* at 450; *Commonwealth* v. *Fortini*, 44 Mass. App. Ct. 562, 568 (1998). This rule does not impose an absolute duty to retreat regardless of personal safety considerations; an individual need not place himself in danger nor use every means of escape short of death before resorting to self-defense. See *Barber, supra* at 1013-1014; *Commonwealth* v. *Hicks*, 22 Mass. App. Ct. 139, 144 (1986). He must, however, use every reasonable avenue of escape available to him. See *Koonce* v. *Commonwealth*, 412 Mass. 71, 74 (1992); *Commonwealth* v. *DeCaro*, 359 Mass.

388, 390 (1971). Whether a defendant used all reasonable means of escape before acting in self-defense is a factual question dependent on a variety of circumstances, including the relative physical capabilities of the combatants, the weapons used, the availability of maneuver room in, or means of escape from, the area, and the location of the assault. Before that question may go to the jury, however, there must be some evidence that the defendant attempted to retreat or that no reasonable means of escape was available. See *Commonwealth* v. *Maguire*, 375 Mass. 768, 772 (1978). In this case, there was no such evidence.

The defendant argues on appeal that, after climbing back over the guardrail, he was unable to retreat from the fight because he was trapped between traffic on the highway and a steep embankment on the other side of the guardrail. Appellate arguments, however, are not evidence. The defendant did not testify at trial that he tried to retreat before throwing the radio at Holmes, nor that he desired to retreat but was unable to do so. The defendant offered no evidence that he attempted to avoid further combat after Holmes flipped him over the guardrail and then let go of him. Rather, the defendant reengaged in the scuffle, coming back over the guardrail, picking up the radio and throwing it several feet towards Holmes. The defendant did not testify to what he argued on appeal: that he reengaged because it was impossible for him to avoid further combat without incurring serious injury. Although evidence was presented that a grass and dirt embankment sloped down toward the river on the other side of the guardrail and that high-speed traffic was moving along the roadway, the defendant at trial never referred to these facts as his motivation for reengaging in the conflict.[4] In the absence of any evidence of an attempt to avoid further physical combat or of the defendant's inability to retreat, no self-defense instruction was required.

---

[4]The defendant did state that he did not want to fight on the side of the roadway, but this testimony was offered to justify stealing Holmes's car, not as evidence of the need to defend himself by throwing the radio. He also alluded to the possibility of rolling down the embankment, but did so as justification for why he walked away from Holmes, after throwing the radio at Holmes, without concern for Holmes's safety. He stated: "Why should I care what he did. . . . Did he care about me, that I could roll down that embankment?" These statements by the defendant, considered in context, do not support the defendant's argument on appeal that he had no reasonable means of escape.

### III

The defendant also argues that the judge erred in refusing to instruct the jury on the defense of necessity with respect to the defendant's unauthorized use of a motor vehicle. A judge should instruct the jury on necessity only if the defendant has presented "some evidence on each element of the defense." *Commonwealth* v. *Hood*, 389 Mass. 581, 595 (1983), quoting *Commonwealth* v. *O'Malley*, 14 Mass. App. Ct. 314, 325 (1982). In other words, the instruction should not be given unless the evidence supports at least a "reasonable doubt whether the [crime] was justified by necessity." *Hood*, *supra* at 594, quoting *Commonwealth* v. *Thurber*, 383 Mass. 328, 331 (1981). The defendant in this case has failed to present such evidence.

The necessity defense is not raised unless each of the following conditions is met: "(1) the defendant is faced with a clear and imminent danger, not one which is debatable or speculative; (2) the defendant can reasonably expect that his action will be effective as the direct cause of abating the danger; (3) there is [no] legal alternative which will be effective in abating the danger; and (4) the Legislature has not acted to preclude the defense by a clear and deliberate choice regarding the values at issue." *Hood*, *supra* at 591, quoting *Commonwealth* v. *Brugmann*, 13 Mass. App. Ct. 373 (1982).

Even if these four elements are satisfied, the necessity defense is not effectively raised unless the defendant can show that the "harm sought to be avoided far exceeds the harm resulting from the crime committed." *Commonwealth* v. *Schuchardt*, 408 Mass. 347, 349 (1990), quoting *Hood*, *supra* at 590. A necessity defense is sustainable "[o]nly when a comparison of the 'competing' harms in specific circumstances clearly favors excusing" the defendant's conduct. *Commonwealth* v. *Hutchins*, 410 Mass. 726, 731 (1991). Finally, the punishable action must be done with the intent to avoid the harm; it is not enough that the action was intended for another purpose and also happened to remove the defendant from danger. See *Commonwealth* v. *Weaver*, 400 Mass. 612, 614-615 (1987).

The evidence, viewed in the light most favorable to the defendant, fails to support a necessity defense for a number of reasons. First, there is no evidence that danger was "imminent" when the defendant and Cutter drove off in Holmes's automobile. Holmes was neither attacking nor threatening the defendant at the time the defendant stole the automobile. A danger that is

"debatable or speculative" is insufficient. See *Hood, supra* at 591; *Schuchardt, supra* at 349; *Commonwealth* v. *Janvrin*, 44 Mass. App. Ct. 917, 918 (1998). Second, the defendant has not shown that he had no lawful alternative with which to abate any danger he may have encountered. "Where there is an effective alternative available which does not involve a violation of the law, the defendant will not be justified in committing a crime." *Commonwealth* v. *Brugmann*, 13 Mass. App. Ct. 373, 379 (1982). Moreover, it is up to the defendant to make himself aware of any available lawful alternatives, "or show them to be futile in the circumstances." *Id.* at 380. The evidence suggests that the defendant had alternatives to driving off in Holmes's automobile. As noted above with respect to the defendant's self-defense claim, there is no evidence that the defendant lacked a reasonable means of escape from the conflict. He argues on appeal that he was unable to leave the scene because of the rushing traffic and steep embankment. But he presented no evidence at trial that these factors prevented him from avoiding further encounters with Holmes. Furthermore, there is no indication that he could not have walked away from Holmes in the breakdown lane to escape injury. He testified that Holmes had flipped him onto the other side of the guardrail. He did not testify that the embankment prevented him from staying there in order to avoid further physical interaction. He also testified that he had been hitchhiking in the breakdown lane for some time and did not state that he feared he would be hit by traffic during that time.

Third, the defendant has not shown that his actions satisfy the competing harms analysis. Even if he was in imminent danger, with no lawful means of escaping it at the moment he stole the automobile, there must be evidence that any harm he might have incurred by staying by the roadside clearly and far exceeded the harm resulting from his theft. He has failed to do this. The defendant testified that Holmes, to the defendant's knowledge, was unarmed. Holmes himself had sustained a head injury when the defendant threw the radio at him. The defendant was a larger man than Holmes, and the defendant and Cutter together outnumbered Holmes. The judge did not err in refusing to instruct the jury on the defense of necessity.

## IV

The defendant argues that the probation condition prohibiting

him from entering Massachusetts during the length of his suspended sentence violates his fundamental right to interstate travel and violates the Fifth and Fourteenth Amendments to the United States Constitution.[5] The condition of the defendant's probation banishing him from the Commonwealth is invalid and his sentence must be revised accordingly.

This court and the Supreme Court of the United States have long recognized that the freedom of interstate travel is a fundamental constitutional right, although the precise source of this right has not been "ascribe[d] . . . to a particular constitutional provision." *Shapiro* v. *Thompson*, 394 U.S. 618, 630 (1969). See *Jones* v. *Helms*, 452 U.S. 412, 417-419 (1981); *Lee* v. *Commissioner of Revenue*, 395 Mass. 527, 529 (1985), citing *Zobel* v. *Williams*, 457 U.S. 55, 60 n.6 (1982). "[O]ur Federal Union and our constitutional concepts of personal liberty unite to require that all citizens be free to travel throughout the length and breadth of our land uninhibited by statutes, rules, or regulations which unreasonably burden or restrict this movement." *Shapiro, supra* at 629. See *Opinion of the Justices*, 357 Mass. 827, 828 (1970). The probation condition banishing the defendant from this Commonwealth for a period of years infringes on that freedom.

Judges are permitted "great latitude" in imposing conditions of probation, see *Commonwealth* v. *Power*, 420 Mass. 410, 413-414 (1995), cert. denied, 516 U.S. 1042 (1996), and may place restrictions on probationers' freedoms that would be unconstitutional if applied to the general public. See *United States* v. *Cothran*, 855 F.2d 749, 751 (11th Cir. 1988); *Porth* v. *Templar*, 453 F.2d 330, 333 (10th Cir. 1971); *Hyser* v. *Reed*, 318 F.2d 225, 239 (D.C. Cir.), cert. denied sub nom. *Thompson* v. *United*

---

[5]The defendant also cites art. 12 of the Massachusetts Declaration of Rights, which states that, "no person shall be . . . exiled . . . but by the judgment of his peers, or the law of the land." But he does no more than mention this provision in passing. This does not rise to the level of appellate argument under Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 921 (1975). Because the defendant engages in "no separate discussion of Massachusetts constitutional principles . . . we review the . . . claim solely on the basis of an alleged violation of Federal constitutional principles." *Lee* v. *Commissioner of Revenue*, 395 Mass. 527, 534 n.10 (1985), quoting *Atterberry* v. *Police Comm'r of Boston*, 392 Mass. 550, 555 (1984), cert. denied sub nom. *Atterberry* v. *Jordan*, 469 U.S. 1208 (1985). See *Commonwealth* v. *Chistolini*, 422 Mass. 854, 858 n.8 (1996) ("Mere mention of the Constitution of the Commonwealth is not an argument based on State constitutional grounds"); *Commonwealth* v. *Monteiro*, 396 Mass. 123, 128 (1985).

*States Bd. of Parole*, 375 U.S. 957, and sub nom. *Jamison* v. *Chappell*, 375 U.S. 957 (1963). "A probation condition is not necessarily invalid simply because it affects a probationer's ability to exercise constitutionally protected rights." *Power*, *supra* at 415. Even fundamental rights, such as the right to interstate travel, are not immune from some constraint through probation conditions. See *id.* at 417.

A probation condition that infringes on constitutional rights must, however, be "reasonably related" to the goals of sentencing and probation. *Id.* at 414. See *Cothran*, *supra* at 751; *United States* v. *Tonry*, 605 F.2d 144, 148 (5th Cir. 1979); *United States* v. *Pierce*, 561 F.2d 735, 739 (9th Cir. 1977), cert. denied, 435 U.S. 923 (1978). This court has named rehabilitation of the probationer and protection of the public as the principal goals of probation. See *Power*, *supra* at 417; *Commonwealth* v. *LaFrance*, 402 Mass. 789, 795 (1988). See also *United States* v. *Albanese*, 554 F.2d 543, 546 (2d Cir. 1977); *Porth*, *supra* at 333. Other goals of probation include punishment, deterrence, and retribution. See *Power*, *supra* at 414. These goals are best served if the conditions of probation are tailored to address the particular characteristics of the defendant and the crime. See, e.g., *Tonry*, *supra* at 148 ("probation conditions must be 'tailored to meet the special problems of particular offenders' "); *Malone* v. *United States*, 502 F.2d 554, 556-557 (9th Cir. 1974), cert. denied, 419 U.S. 1124 (1975).

Whether banishment is a valid condition of probation is a matter of first impression in Massachusetts. The majority of jurisdictions to have considered the matter hold that a probation condition banishing a defendant from a State is invalid and unenforceable because it infringes on his constitutional right to interstate travel and is not reasonably related to the goals of probation. Not all probation conditions restricting an individual's movement are invalid; conditions barring probationers from certain small geographic areas have been upheld in several States when they served the goals of probation. See, e.g., *Wyche* v. *State*, 197 Ga. App. 148, 149 (1990) (upholding probation condition barring probationer from five-county area in which he had "succumbed to the temptation of drugs"); *State* v. *Morgan*, 389 So. 2d 364, 366 (La. 1980) (where defendant was convicted of attempted prostitution, court upheld probation condition ordering defendant to remain outside French Quarter, reasoning that it was a "small geographical area . . . with carefully

delineated boundaries" and "noted for . . . prostitution," and thus defendant's exclusion was reasonably related to her rehabilitation); *Cobb* v. *State*, 437 So. 2d 1218, 1220 (Miss. 1983) (upholding probation condition requiring defendant to stay out of county in which nephew lived, where defendant was convicted of shooting nephew); *State* v. *Charlton*, 115 N.M. 35, 38 (Ct. App. 1992) (noting that conditions barring a probationer from a location "such as a bar or school" generally have been upheld); *State* v. *Nienhardt*, 196 Wis. 2d 161, 167-168 (Ct. App. 1995) (where defendant was convicted of harassment of individual residing in Cedarburg, court upheld probation condition requiring defendant to stay out of that town). Banishment from an entire State, however, has been held to be invalid by numerous courts because it serves none of the goals of probation and "implicates serious public policy questions against the dumping of convicts on another jurisdiction." *McCreary* v. *State*, 582 So. 2d 425, 428 (Miss. 1991).

"[B]anishment from a large geographical area, especially outside of the state, struggles to serve any rehabilitative purpose." *Id.* Notwithstanding the Commonwealth's conclusory assertion that, "it is only logical that [banishment] would ideally have a rehabilitative effect on the defendant," there is no showing that the defendant's inability to enter Massachusetts is likely to have a rehabilitative effect. Whatever crimes the defendant may be disposed to commit, there is no showing at all that he would be more inclined to commit them in the Commonwealth or more likely to reform if he stayed away from the Commonwealth.

Nor does the defendant's banishment serve a legitimate public safety goal. The Commonwealth argues that the judge properly "exercised his authority to protect persons within this State." It is against constitutional principles of interstate comity to "make other states a dumping ground for our criminals," *State* v. *Doughtie*, 237 N.C. 368, 371 (1953), any more than our solid waste. Cf. *Philadelphia* v. *New Jersey*, 437 U.S. 617 (1978). Numerous courts have embraced the rationale of *People* v. *Baum*, 251 Mich. 187, 189 (1930), in which the Supreme Court of Michigan reasoned that "permit[ting] one State to dump its convict criminals into another . . . would tend to incite dissension, provoke retaliation, and disturb that fundamental equality of political rights among the several States which is the basis of the Union itself. Such a method of punishment is . . . impliedly

prohibited by public policy." See, e.g., *Rutherford* v. *Blankenship*, 468 F. Supp. 1357, 1360 (W.D. Va. 1979); *State ex rel. Halverson* v. *Young*, 278 Minn. 381, 385 (1967); *Charlton, supra* at 38; *People* v. *Green*, 114 Misc. 2d 339, 342 (N.Y. 1982); *State* v. *Gilliam*, 274 S.C. 324 (1980).[6]

Banishment also fails to serve a deterrent purpose. The Commonwealth argues that the banishment condition is justifiable because it would prevent the defendant from traveling the roadways of Massachusetts, on which his offenses were committed. But the Commonwealth has not explained how the defendant's presence on a Massachusetts roadway, as opposed to a roadway in some other State, was a critical influence sparking his criminal conduct. We are left with nothing more than the sense that being excluded from the Commonwealth would be a particularly galling reminder to the defendant of his misdeeds, and that is not enough.

The invalidity of the banishment condition does not necessarily invalidate the defendant's entire sentence. In cases in which this court has found probation conditions to be invalid, we have remanded to the Superior Court for revision of the conditions of probation. See *Commonwealth* v. *LaFrance*, 402 Mass. 789, 796 (1988). Similarly, other courts that have found banishment conditions invalid have left the conviction and remaining portion of the sentence intact and ordered the lower court to revise the sentence to remove the offending condition. See *Rutherford, supra* at 1361; *People* v. *Harris*, 238 Ill. App. 3d 575, 583 (1992); *Charlton, supra* at 38; *Green, supra* at 344. Accordingly, we affirm the judgments but remand the case to the Superior Court for resentencing in accordance with this opinion.

*So ordered.*

---

[6]Some courts have suggested that where, as in Massachusetts, there is no State statute authorizing banishment, this absence is proof of a banishment condition's contravention of public policy. See *Rutherford* v. *Blankenship*, 468 F. Supp. 1357, 1360 (W.D. Va. 1979) ("[T]he power to banish, if it exists at all, is a power vested in the Legislature and certainly where such methods of punishment are not authorized by statute, it is impliedly prohibited by public policy"); *State* v. *Doughtie*, 237 N.C. 368, 371 (1953) ("In the absence of statutory authorization, banishment . . . is not proper punishment"); *State* v. *Charlton*, 115 N.M. 35, 37 (Ct. App. 1992) ("The New Mexico criminal code does not specifically authorize the banishment of criminal defendants from the state. The legislature's refusal to authorize banishment as a sentencing option is evidence that banishment is contrary to the public policy of this state").