642      55 Mass. App. Ct. 642 (2002)

Commonwealth *v.* Toon.

COMMONWEALTH *vs.* TROY A. TOON.

No. 00-P-1053.

Dukes County. April 8, 2002. - August 22, 2002.

Present: RAPOZA, MASON, & GRASSO, JJ.

*Homicide. Practice, Criminal,* Instructions to jury, Presumptions and burden of proof, New trial. *Self-Defense. Evidence,* Self-defense.

Discussion, in the context of a murder trial, of the circumstances under which a defendant is entitled to an instruction on the right to use deadly force in self-defense. [644-646]

The defendant at a murder trial was not entitled to an instruction on the right to use deadly force in self-defense, where the evidence was insufficient to raise a reasonable doubt that the defendant actually believed that he was in imminent danger of death or grievous bodily harm from which he could save himself only by using deadly force, or that the defendant had availed himself of all proper means to avoid physical combat before resorting to self-defense. [650-654]

There was no merit to a criminal defendant's claim that the trial judge's instruction on inferences, requested by defense counsel, shifted the burden of proof and required the defendant to prove facts consistent with innocence beyond a reasonable doubt. [655-656]

A motion judge did not err in denying a criminal defendant's motion for a new trial, which alleged that coaching of a witness by a court room spectator might have influenced the jury, where the motion judge, who was also the trial judge, had noticed the spectator nodding and gesturing during the witness's testimony, had called the matter to counsels' attention, and after determining that the spectator had not been coaching the witness, had taken prompt curative action and determined that there was no necessity for declaring a mistrial. [656-657]

INDICTMENT found and returned in the Superior Court Department on September 24, 1998.

The case was tried before *John A. Tierney,* J., and a motion for a new trial, filed on March 23, 2001, was considered by him.

*Ruth Greenberg* for the defendant.

*Julia K. Holler,* Assistant District Attorney, for the Commonwealth.

GRASSO, J. In the early morning of Saturday, July 11, 1998, the defendant Troy A. Toon stabbed Gary Moreis on Warwick Avenue in the Oak Bluffs section of Martha's Vineyard. Moreis bled to death. A jury found the defendant guilty upon indictments charging murder in the second degree and assault and battery by means of a dangerous weapon, a knife.[1] On appeal, the defendant contends that (1) erroneous instructions on self-defense and the use of excessive force in self-defense prevented the jury from returning a verdict of voluntary manslaughter, and (2) a requested, but erroneous, instruction on inferences shifted the burden of proof. He also maintains that the trial judge erred in denying his motion for a new trial, which contended that coaching of a witness by a court room spectator may have influenced the jury.

We conclude that the defendant was not entitled to a self-defense instruction at all and, therefore, was not entitled to an instruction on the use of excessive force in self-defense. We also conclude that the judge did not err in instructing the jury on inferences and did not abuse his discretion in denying the motion for a new trial. Accordingly, we affirm the conviction.

1. *Background.* At trial, there was no dispute that, in the course of a street fight, the defendant had stabbed Moreis, who was unarmed. The issue was whether Moreis's death was a justified exercise of self-defense, murder, or a mitigated killing — voluntary manslaughter. The judge instructed the jury on second degree murder, self-defense, and voluntary manslaughter based upon the mitigating factors of excessive force in self-defense, sudden transport of passion or heat of blood upon a reasonable provocation (sometimes referred to as "heat of passion"), and transport of passion or heat of blood upon sudden combat.[2] The defendant does not challenge the correctness of

[1]The indictment for assault and battery by means of a dangerous weapon was placed on file and is not before us. See *Commonwealth v. Delgado*, 367 Mass. 432, 438 (1975); *Commonwealth v. Dahl*, 430 Mass. 813, 814 n.1 (2000).

[2]Murder is an unlawful killing with malice. A killing done in self-defense, because justified, is not unlawful. Malice is any unexcused intent to kill, to do grievous bodily harm, or to do an act creating a plain and strong likelihood that death will follow. Although unlawful, an intentional killing may be

the judge's instructions on reasonable provocation based upon heat of passion or sudden combat.

The Commonwealth did not challenge, nor did the trial judge dwell upon, whether the evidence adequately raised self-defense. Faced with subtle and complex issues best resolved by meticulous combing of the record, trial judges will understandably err on the side of caution in determining that self-defense has been raised sufficiently to warrant an instruction. We are not so constrained on appeal. Whether an allegedly erroneous instruction on self-defense (and excessive force in self-defense) is prejudicial (or creates a substantial risk of a miscarriage of justice) necessarily involves examining first whether self-defense was raised sufficiently. If not, the defendant received more than he was entitled to. See *Commonwealth* v. *Curtis*, 417 Mass. 619, 632 (1994); *Commonwealth* v. *Torres*, 420 Mass. 479, 492-493 (1995); *Commonwealth* v. *Doucette*, 430 Mass. 461, 470 (1999); *Commonwealth* v. *Taylor*, 32 Mass. App. Ct. 570, 578-579 (1992).

2. *Raising self-defense.* Before the defendant is entitled to an instruction on the right to use deadly force in self-defense, see *Commonwealth* v. *Rodriguez*, 370 Mass. 684, 687-688 (1976), the evidence must raise a reasonable doubt as to the defendant's right to use such force.[3] As stated in *Commonwealth* v. *Harrington*, 379 Mass. 446, 450 (1980):                    .

---

voluntary manslaughter, and not murder, if malice is mitigated by adequate provocation. Reasonable provocation negates malice in any unlawful killing. *Commonwealth* v. *Boucher*, 403 Mass. 659, 664 (1989). Malice and adequate provocation are mutually exclusive. *Ibid.*

When an unlawful and otherwise intentional killing is committed due to a sudden transport of passion or heat of blood upon a reasonable provocation or upon sudden combat, it is not murder but voluntary manslaughter. See *Commonwealth* v. *Whitman*, 430 Mass. 746, 750 (2000). Similarly, an unlawful and intentional killing due to excessive force in otherwise lawful self-defense is not murder but is mitigated to voluntary manslaughter. See *Commonwealth* v. *Boucher, supra.*

[3]What constitutes deadly force tracks the longstanding definition of a "dangerous weapon," an instrument that, as used, is likely to cause death or serious bodily injury. *Commonwealth* v. *Klein*, 372 Mass. 823, 827 (1977). Here, use of a knife to stab Moreis is the use of deadly force. See *Commonwealth* v. *Appleby*, 380 Mass. 296, 303 (1980); *Commonwealth* v. *Cataldo*, 423 Mass. 318, 322 (1996); *Commonwealth* v. *Pike*, 428 Mass. 393, 396 n.3 (1998).

"A defendant is entitled to have the jury at his trial instructed on the law relating to self-defense if the evidence, viewed in the light most favorable to him, is sufficient to raise the issue. *Commonwealth* v. *Monico*, 373 Mass. 298, 299 (1977). There must be evidence warranting at least a reasonable doubt that the defendant: (1) had reasonable ground to believe and actually did believe that he was in imminent danger of death or serious bodily harm, from which he could save himself only by using deadly force, (2) had availed himself of all proper means to avoid physical combat before resorting to the use of deadly force, and (3) used no more force than was reasonably necessary in all the circumstances of the case. *Commonwealth* v. *Harris*, 376 Mass. 201, 208 (1978), and cases cited."[4]

*Harrington* inquires whether, viewed in the light most favorable to the defendant, the evidence, together with the reasonable inferences, raises a reasonable doubt as to each of the predicates for the use of deadly force in self-defense.[5] See *Commonwealth* v. *Haddock*, 46 Mass. App. Ct. 246, 249 (1999) ("meeting the threshold burden merely provides a permissible basis for an inference that the defense in question applies" and a jury instruction is warranted). "In determining whether sufficient evidence of self-defense exists, all reasonable inferences should be resolved in favor of the defendant, and no matter how incred-

---

[4]In dictum following the quoted passage, *Harrington* notes that "[a]bsent the latter two elements, an instruction on manslaughter because of reasonable provocation or because of the use of excessive force in self-defense may be warranted." This approach has been overruled by *Commonwealth* v. *Curtis*, 417 Mass. at 632 n.11, and *Commonwealth* v. *Berry*, 431 Mass. 326, 335 (2000). Conceptually, the first two components of self-defense address the right to use self-defense, while the third component speaks to the quantum of force permissible. Whether the defendant used no more force than was reasonably necessary in all the circumstances is, "ordinarily," a factual determination for the jury once the defendant properly invokes the privilege to use self-defense by raising a reasonable doubt as to the first and second components. See *Commonwealth* v. *Kendrick*, 351 Mass. 203, 211 (1966); *Commonwealth* v. *Johnson*, 412 Mass. 368, 372 (1992); *Commonwealth* v. *Pike*, 428 Mass. at 397.

[5]The right to use nondeadly force, such as one's fists, arises at a somewhat lower level of danger (a reasonable concern for personal safety) than the right to use deadly force. *Commonwealth* v. *Bastarache*, 382 Mass. 86, 105 & n.15 (1980).

ible his testimony, that testimony must be treated as true." *Commonwealth* v. *Pike*, 428 Mass. 393, 395 (1998).

3. *The witnesses called by the Commonwealth.* The Commonwealth presented testimony from all the percipient witnesses to the altercation. Through cross-examination, the defense sought to convey that the defendant had stabbed Moreis *after* Moreis had pinned the defendant against a van and was choking him, thereby suggesting that (1) the defendant must have believed he was in imminent danger of death or grievous bodily harm from which he could save himself only by using deadly force, and (2) he could not have retreated at the time of the stabbing. The focus was on when and where the stabbing had occurred and at what point the defendant had threatened to cut Moreis with a knife. Against this backdrop, we have examined in careful detail the evidence bearing on self-defense.[6]

With the victim was his cousin, Evelyn Larkin. With the defendant were his brother, Ducas Matthews, and two female companions, Maria Gomes and Megan Jennings. As might be expected, Larkin presented an account more favorable to Moreis. Matthews, Jennings, and Gomes presented accounts more favorable to the defendant. From their testimony emerged uncontroverted facts, as well as diametrically different views of what transpired.

Minor inconsistencies aside, the testimony established that at about 10:45 P.M. on Friday, July 10, Moreis, who was thirty-six years old and lived on Martha's Vineyard, had a chance encounter with his cousin Larkin. They socialized for about two hours at the Atlantic Connection, a local bar. There, Larkin observed Moreis consume one drink.[7]

The defendant, who was twenty-four, had come to Martha's Vineyard to visit his father and his brother, Ducas Matthews. Prior to the fatal altercation, the defendant, Matthews, and Go-

---

[6]Because the defendant does not challenge the judge's instructions on a sudden transport of passion or heat of blood upon (1) reasonable provocation and (2) sudden combat, we need not assess the sufficiency of the evidence bearing upon these mitigating factors.

See *Commonwealth* v. *Greene*, 372 Mass. 517, 518-519 (1977) (Commonwealth has the burden of disproving provocation).

[7]Moreis died at the hospital some five hours after the fight. An autopsy established that Moreis had consumed cocaine within six hours of his death.

mes had been together all evening, first at a private residence where Gomes had consumed a considerable amount of alcohol. At about 11:30 p.m. they proceeded to the Lamp Post, another local bar. Because, at nineteen, Matthews was underage, he could not accompany the defendant and Gomes inside the Lamp Post. He remained outside, where he encountered Jennings. As the bars began to close, each group headed off.

Larkin set out to drive Moreis to a campground where he lived with his girlfriend, Andrea Hayden. En route, Moreis asked Larkin to stop briefly at Warwick Avenue, where he owned a garage. Coincidentally, the defendant, Matthews, Jennings, and Gomes were headed toward Warwick Avenue to locate a man named Robert Correia, some marijuana, and a party.

At this point, the specifics diverge, with the testimony of Jennings, Matthews, and Gomes differing starkly from that of Larkin.[8] According to the defendant's companions, Moreis had encountered the defendant, Matthews, Gomes, and Jennings around 1:00 a.m. on Warwick Avenue. Moreis approached the group and yelled epithets, directed particularly toward the defendant, asking what the defendant was doing on Moreis's street. Moreis, who was five feet seven inches tall, 190 pounds, and well built, was acting "crazy." We examine more closely the testimony of Jennings, Matthews and Gomes.

*Jennings's testimony.* According to Jennings, the confrontation began when Moreis approached and, amidst a barrage of profanities, called the defendant a "pretty boy." The defendant responded that he wasn't looking for trouble, but for Rob (Correia). Meanwhile, Matthews sought to defuse the situation. Ignoring Matthews's attempts at diplomacy, Moreis continued to yell and called the defendant a "pretty boy" and told the

---

[8]Larkin testified that as she waited in her parked car for Moreis to return, she heard loud, angry voices coming from behind her car and went to investigate. There she found Moreis and the defendant engaged in an escalating exchange of unpleasantries. According to Larkin, the defendant was advancing on Moreis while holding a knife and threatening to "take out" Moreis, who held no weapon.

Larkin testified that the defendant stabbed Moreis while facing him in the middle of the street. Moreis then put his hand to his stomach, saw blood, swore at the defendant for stabbing him, and began to fight.

defendant that he would "whip [his] ass." According to Jennings, the defendant said, "If you want to fight we fight, but I am not going to back off because you are an older man. . . . Knock it off, or I'll doink [stab] you." Jennings did not see a knife in the defendant's hand as he said this. Moreis told the defendant to go ahead and "doink" him "if that's going to make you a bigger man." Jennings was unequivocal (as were Matthews and Gonsalves) that Moreis struck the first blow.

Jennings testified that Moreis grabbed the defendant by the shirt and pushed him back against the van, but that the defendant was able to push Moreis off him. The defendant told Moreis to back off him, but Moreis did not and continued to call the defendant a "punk" and a "pretty boy," and told the defendant to leave the area. Jennings stated that when Moreis stepped back, she saw blood on Moreis's shirt.

Jennings (and all the witnesses) testified that Moreis continued to fight with the defendant even after he had been stabbed. Moreis ripped off his shirt, grabbed the defendant by the throat, and threw him against a van. He pummeled the defendant, who fell against a car and onto the ground, skinning his knees.[9] At this point, Gomes and Matthews intervened and pulled the combatants apart. Moreis leaned against a black pickup truck and grabbed a lawnchair from its open cab. Seeing this, Matthews armed himself with a table leg. Before the combatants could inflict further damage, a neighbor appeared, took the chair from Moreis, and declared an end to the fight.

Jennings related that later that night, the defendant said to her: "I don't know why this even happened, because I don't know him and he came in my face was [*sic*] starting with me, and I warned him to back off and he wouldn't back off." The defendant told her that when they started fighting "I didn't feel the knife come out. . . I only got him once."

*Matthews's testimony.* Matthews corroborated much of Jen-

---

[9]Skilled cross-examination did not shake Jennings's recollection that the defendant had threatened to stab Moreis before Moreis grabbed the defendant by the throat and threw him against a van. Jennings did, however, equivocate on cross-examination and redirect as to whether she had observed the blood that signified Moreis had been stabbed *before* Moreis threw the defendant against the van. Jennings indicated that Moreis's grabbing the defendant by the throat did not prevent the defendant from telling Moreis to get off him.

nings's testimony, but differed in some details. He confirmed that a hostile Moreis had approached them with a balled fist shouting profanities. Matthews added that, before Moreis struck the first blow, Matthews had pushed Moreis away from the defendant on three occasions and attempted to convince Moreis that Moreis knew Matthews and Matthews's father and that the defendant was Matthews's brother.

According to Matthews, Moreis threw the first punch "from nowhere," and after the first blow, Matthews moved away and let Moreis and the defendant fight.[10] After the two had exchanged blows for a while, Moreis had the defendant against a white van and was "choking" him. Neither on direct nor on cross-examination did Matthews (or any witness) provide any detail as to the "choking" — whether with one hand or two, how long it lasted, and what observable effect, if any, it had upon the defendant.

Although he did not observe the actual stabbing, Matthews first observed blood on Moreis *after* Moreis and the defendant struggled at the car. Matthews and Gomes went to the defendant's aid when the defendant called out to Matthews for help, this at the point in the altercation after Moreis, who had ripped his shirt off and was bleeding heavily, was pummeling the defendant on the ground.

Matthews was vague as to the point in the altercation when the defendant told Moreis to get back or he would stab him, but acknowledged that the defendant had responded to Moreis's insults by saying that he would not back down. Matthews also acknowledged that there was nothing preventing the defendant and his group from leaving the street other than their desire to meet Correia to purchase marijuana.

*Gomes's testimony.* Gomes testified similarly to Matthews, but offered little from which the precise sequence of events culminating in the stabbing could be deduced. By her own admission, Gomes had been drinking heavily. She had consumed a quarter pint of Goldschlager liquor and some beer at home,

---

[10]We note that upon correct instructions the jury found that the Commonwealth had proved the defendant was not acting upon reasonable provocation or upon sudden combat, thereby rejecting mitigation of murder to manslaughter upon this theory.

and a few more beers and one or two "grape crushes" at the Lamp Post. She was "buzzed" and went right to sleep upon arriving home after the incident.

There was no dispute that at the conclusion of the fight the injuries to the defendant consisted of a skinned knee, a swollen eye, and bruised knuckles. Also undisputed was that Moreis had never displayed or threatened to use a dangerous weapon.

4. *The evidence as to self-defense.* Here, the evidence was insufficient to raise a reasonable doubt as to (1) the defendant's actual belief that he was in imminent danger of death or grievous bodily harm from which he could only save himself by using deadly force; and (2) whether the defendant had availed himself of all proper means to avoid physical combat before resorting to self-defense. See *Commonwealth* v. *Walden*, 380 Mass. 724, 729 (1980); *Commonwealth* v. *Torres*, 420 Mass. 479, 492-493 (1995); *Commonwealth* v. *Reed*, 427 Mass. 100, 103 (1998); *Commonwealth* v. *Pike*, 428 Mass. 393, 396-397 (1998). Failure to raise a reasonable doubt as to either of these predicates is fatal to a claim of self-defense. Our analysis begins upon the proposition that the defendant did not use deadly force until the *stabbing* of Moreis. The defendant's verbal threat to stab Moreis is not *use* of a dangerous weapon for purposes of determining the defendant's right to use deadly force in his own defense. Compare *Commonwealth* v. *Cataldo*, 423 Mass. 318, 322 & n.4 (1996).

a. *The defendant's actual belief.* A defendant's actual belief that he was in imminent danger of death or serious bodily harm from which he could only save himself by using deadly force looks to the defendant's subjective state of mind. See *Commonwealth* v. *Mellone*, 24 Mass. App. Ct. 275, 282 (1987). A reasonable doubt as to the defendant's actual belief is most often, and most easily, raised by direct evidence in the form of the defendant's testimony.[11] However, a defendant is not required to testify or to present any evidence and may rely entirely on the Commonwealth's case to raise such a reasonable

---

[11]The only direct evidence bearing on the defendant's state of mind came through Jennings's testimony that the defendant later told her "none of this should have happened" and that the reason the defendant stabbed Moreis is because "he wouldn't back off."

doubt. Here, in contrast to most self-defense cases, the defendant neither testified nor introduced any evidence regarding his state of mind. See, e.g., *Commonwealth* v. *Stokes*, 374 Mass. 583, 586 (1978); *Commonwealth* v. *Acevedo*, 427 Mass. 714, 715 (1998); *Commonwealth* v. *Niemic*, 427 Mass. 718, 719 (1998); *Commonwealth* v. *Noble*, 429 Mass. 44, 45 (1999); *Commonwealth* v. *Carlino*, 429 Mass. 692, 694 (1999); *Commonwealth* v. *Whitman*, 430 Mass. 746, 748-749 (2000); *Commonwealth* v. *Taylor*, 32 Mass. App. Ct. 570, 573 (1992); *Commonwealth* v. *Grant*, 49 Mass. App. Ct. 169, 170 (2000). Nor was hearsay evidence concerning the defendant's state of mind admitted pursuant to an exception to the hearsay rule, or otherwise. Compare *Commonwealth* v. *Burbank*, 388 Mass. 789, 794-795 (1983) (because hearsay statements as to the defendant's state of mind were admitted without objection, the statements could be considered substantively in determining whether an instruction on self-defense was warranted). Without direct evidence as to the defendant's actual belief that he was in imminent danger of death or serious bodily harm from which he could only extricate himself by using deadly force, evidence as to the right to use deadly force in self-defense depended entirely upon inference from circumstantial evidence.[12] See *Commonwealth* v. *Torres*, 420 Mass. at 482. On this, the evidence was insufficient.

Although neither Matthews nor Gomes had witnessed the stabbing, their testimony would permit the inference that the defendant had stabbed Moreis when Moreis had pushed or thrown the defendant against the van and was "choking" him.

---

[12]That a defendant may need to testify or present evidence in order to raise self-defense does not violate State or Federal constitutional privileges against self-incrimination. See *Commonwealth* v. *Beauchamp*, 49 Mass. App. Ct. 591, 606-607 (2000) (that the defendant felt "virtually compelled" to testify did not infringe on privilege against self-incrimination); *Williams* v. *Florida*, 399 U.S. 78, 83-84 (1970) ("The defendant in a criminal trial is frequently forced to testify himself . . . in an effort to reduce the risk of conviction. . . . That the defendant faces such a dilemma demanding a choice between complete silence and presenting a defense has never been thought an invasion of the privilege against compelled self-incrimination"). For the Federal and State privileges against self-incrimination to attach, the State must compel the defendant to produce testimonial evidence. See *Commonwealth* v. *Seabrooks*, 433 Mass. 439, 451 (2001).

Even viewed in this light, the evidence does not raise a reasonable doubt that at that time the defendant had an actual belief that he was in imminent danger of death or serious bodily harm from which he could save himself only by using deadly force. See *Commonwealth* v. *Torres*, 420 Mass. at 492-493 (no evidence that defendant had an actual and reasonable belief of imminent danger of death or grievous bodily harm and no evidence defendant availed himself of all proper means to avoid physical combat); *Commonwealth* v. *Pike*, 428 Mass. at 396.

The witnesses' bare characterizations — "grabbed by the throat" (Jennings) and "choke" (Matthews and Gomes) — permit no inference, let alone a reasonable inference, as to the defendant's actual belief, at the critical moment of the stabbing, that he was in imminent danger of death or serious bodily harm from which he could only save himself by deadly force. Hence, such characterizations shed no light upon and raise no reasonable doubt upon that necessary component of self-defense. Moreover, neither the testimony nor the physical evidence provided a factual basis from which a reasonable doubt as to the defendant's actual belief might be reasonably inferred. Beyond the mere characterization, no witness described what the choking consisted of, its intensity, its duration, or whether it had observable effect on the defendant or prevented the ability to cry out.[13] Neither did the physical evidence, such as the photographs of the defendant's injuries, depict any discernable injury to the defendant's neck from which might arise the desired inference that the choking would have actually inspired in the defendant the requisite fear and belief that resorting to deadly force was the only option.[14] Compare *Commonwealth* v. *Berry*, 431 Mass. 326, 336 n.11 (2000). Rather than raising a reasonable doubt that the defendant had an actual belief that he was in imminent danger of death or serious bodily harm and that deadly force was his only option, all the evidence sug-

---

[13]We note that at a later point in the altercation when the defendant was on the ground and being pummeled after the stabbing, he was able to call out to his brother to assist and that Matthews and Gomes complied. See note 9, *supra.*

[14]It is uncontrovertible that the defendant and his brother outnumbered Moreis and that the defendant knew enough to call to his brother for assistance when at a disadvantage.

gested that the reason for the altercation and ultimately for the stabbing was the defendant's intent to defend his manhood against a perceived challenge by a combative and unruly stranger.[15]

b. *The duty to retreat.* Additionally, the evidence raised no reasonable doubt that the defendant had availed himself of all proper means to avoid physical combat before resorting to the use of any force, deadly or nondeadly. See *Commonwealth* v. *DeCaro*, 359 Mass. 388, 390 (1971) (a defendant must use every reasonable avenue of escape available to him); *Commonwealth* v. *Maguire*, 375 Mass. 768, 772 (1978) (before self-defense may go to the jury, there must be some evidence that the defendant attempted to retreat or that no reasonable means of escape was available); *Commonwealth* v. *Bastarache*, 382 Mass. 86, 105 n.15 (1980) (retreat is a predicate to the use of even nondeadly force in self-defense). A self-defense instruction is not required unless there is some evidence that the defendant availed himself of all means, proper and reasonable under the circumstances, of retreating from the conflict before resorting to the use of deadly force. See *Commonwealth* v. *Kendrick*, 351 Mass. at 212; *Commonwealth* v. *Niemic*, 427 Mass. at 722; *Commonwealth* v. *Pike*, 428 Mass. at 398-399; *Commonwealth* v. *Fortini*, 44 Mass. App. Ct. 562, 568 (1998).

Even in the light most favorable to the defendant, it was unmistakable that Moreis did not want the defendant and his friends on Warwick Avenue and that the defendant and his friends did not wish to leave. The confrontation occurred on a public street, with both access and opportunity to retreat in the face of Moreis's threats and insults. The defendant could have walked away at any time. See *Commonwealth* v. *Berry*, 431 Mass. at 335. There was simply no evidence that an avenue of escape was unavailable to the defendant at the start of the confrontation. Nor was there any evidence that the defendant availed himself of all means to avoid combat before resorting even to nondeadly force.

While the defendant may have had an equal right to remain on the public street, the measure of a duty to retreat is not

[15]Moreover, the evidence was insufficient to raise a reasonable doubt as to the objective reasonableness of the defendant's belief.

equality of right to remain in the face of an unreasonable demand, but the ability to retreat. A stubborn unwillingness to walk away, even in the face of a perceived affront to the defendant's manhood, does not equate with an inability to retreat any more than it manifests a concern for personal safety. We need not decide whether under different circumstances, not present here, a right to remain might justify an unwillingness to back down in the face of an unreasonable demand to leave. Suffice to say, here the only proffered reason that the defendant and his friends were there, and remained, was to buy marijuana. Before either nondeadly force or deadly force may be invoked, the duty to retreat must be observed. See *Commonwealth* v. *Niemic*, 427 Mass. at 722 (if a defendant has an opportunity to retreat, but fails to do so, he has no privilege to use force in self-defense). Even were we to accept the dubious proposition advanced by the defendant that the defendant's threat to stab Moreis may be viewed as a way of *avoiding* a confrontation by conveying to Moreis the wisdom of backing down or facing serious injury, there remains, nevertheless, a duty to retreat, if possible, before resorting to force, whether nondeadly or deadly. See *Commonwealth* v. *Bastarache*, 382 Mass. at 105 n.15; *Commonwealth* v. *Bertrand*, 385 Mass. 356, 362 (1982); *Commonwealth* v. *Berry*, 431 Mass. at 335.[16]

We need not linger upon the defendant's contention that once the evidence raises a reasonable doubt as to his right to use *nondeadly* force in self-defense, then the jury should determine whether his use of *deadly force* is excessive force. Such a position would change the longstanding rule in this Commonwealth that before one is entitled to an instruction on the use of *deadly* force in self-defense, the evidence must raise a reasonable doubt as to his actual and reasonable belief that he was in imminent danger of death or serious bodily harm, not as to a mere concern for personal safety. See *Commonwealth* v. *Bastarache*, 382 Mass. at 105 n.15; *Commonwealth* v. *Curtis*, 417 Mass. 619,

---

[16]Because the defendant raised no reasonable doubt as to the imminent danger prong of deadly force self-defense, we need not consider whether, or under what circumstances, a defendant who does not initially have a right to use even nondeadly force because of a failure to retreat may later avail himself of deadly force in self-defense due to intervening and unforeseen facts.

632 n.11 (1994) (the law requires that there be a right to use *deadly* force in self-defense before a defendant may use such force); *Commonwealth* v. *Berry*, 431 Mass. at 336 (absent a right to use deadly force in self-defense, an instruction on excessive force in self-defense is not available).[17]

5. *The instruction on inferences and the motion for a new trial.* There is no merit to the defendant's strained contention that the judge's instruction on inferences, requested by defense counsel, shifted the burden of proof and required the defendant to prove facts consistent with innocence beyond a reasonable doubt. In discussing circumstantial proof and inferences, the judge cautioned the jury that they may only draw inferences and conclusions from "facts proven . . . beyond a reasonable doubt." Such an instruction overstates the burden that is upon the Commonwealth.[18] Moreover, in context, the instruction unmistakably refers to the burden of proof that is upon the Commonwealth, not to inferences that are favorable to the defendant. The judge told the jury that "[w]hether the evidence is direct evidence or circumstantial evidence, the Commonwealth must prove the defendant's guilt beyond a reason-

---

[17]Whether a defendant raises nondeadly force self-defense (concern for personal safety) or deadly force self-defense (imminent danger of death or serious bodily harm), a jury only determines whether the defendant used excessive force when the Commonwealth fails to prove beyond a reasonable doubt that the defendant was not privileged to exercise self-defense. Ordinarily, whether the evidence sufficiently raises the right to self-defense will focus upon components one (the impending harm avoidable only by the use of force) and two (the duty to retreat). Once self-defense is properly raised, it is only when the Commonwealth fails to prove that the defendant was not privileged to use self-defense (when the Commonwealth fails to prove beyond a reasonable doubt that the defendant did not face impending harm avoidable only by use of force *or* fails to prove beyond a reasonable doubt that the defendant did not avail himself of retreat) that the jury need decide whether the Commonwealth has proved that the defendant used more force than was reasonably necessary. See note 4, *supra.*

[18]The Commonwealth need not prove each subsidiary fact beyond a reasonable doubt before an inference is permitted as to an essential element of the offense. See *Commonwealth* v. *Lawrence*, 404 Mass. 378, 394 (1989). Rather, "the evidence and the inferences permitted to be drawn therefrom must be 'of sufficient force to bring minds of ordinary intelligence and sagacity to the persuasion of [guilt] beyond a reasonable doubt.' " *Commonwealth* v. *Latimore*, 378 Mass. 671, 677 (1979). Only the *elements* of the offense need be proven beyond a reasonable doubt. See *Commonwealth* v. *Matthews*, 49 Mass. App. Ct. 365, 367-369 & n.2 (2000).

able doubt." The judge also instructed the jury numerous times in clear language that the burden of proof was always upon the Commonwealth, that the defendant was presumed innocent, and that the defendant did not have to prove or disprove anything.

"In determining the propriety of a jury instruction on appeal, we consider the instruction 'in the context in which it was delivered, in order that we might determine its probable effect on the jury's understanding of their function.' " *Commonwealth* v. *Johnson*, 422 Mass. 420, 428 (1996) (citation omitted) (footnote omitted). See *Commonwealth* v. *Murray*, 51 Mass. App. Ct. 57, 62-63 (2001) ("In assessing potential errors in a judge's instruction, we evaluate the instruction as a whole, . . . look[ing] at the 'interpretation a reasonable juror would place on the judge's words' and do not analyze bits and pieces of the instruction removed from their context" [citation omitted]). Here, the now challenged language could not have confused the jury into believing that the defendant had any burden of proof, or that the jury could only draw inferences favorable to the defendant if the defendant proved the underlying facts beyond a reasonable doubt. See *Commonwealth* v. *Torres*, 420 Mass. at 490. There is no error, and no substantial risk of a miscarriage of justice.

Finally, we reject the defendant's contention that the trial judge abused his discretion in refusing to declare a mistrial or to hold an evidentiary hearing to determine whether alleged coaching by a court room spectator during Larkin's testimony may have influenced the jury. At trial, the judge noticed that an individual seated in the court room was gesturing and nodding her head as Larkin testified. The judge called the matter to counsels' attention and took prompt and intelligent curative steps. The judge removed the jury, admonished the individual not to nod encouragement to the witness, and advised the audience that anyone doing so would be removed from the court room. Contrary to the defendant's characterization that the individual was coaching the witness, the judge observed that the spectator's gestures were not directing the witness how to testify, but were in the nature of general nods of encouragement. The judge was not required to declare a mistrial upon defense counsel's pro forma objection, nor did he abuse his discretion

in determining that there was no manifest necessity for doing so. See *Commonwealth* v. *Cunneen*, 389 Mass. 216, 223 (1983). The nodding had not even been noticed by defense counsel, and the judge could rightly conclude that the incident, while inappropriate, did not rise to a level warranting the individual's removal from the court room, let alone one requiring a mistrial.

Neither the defendant's new trial motion nor counsel's supporting affidavit raised a claim that this was an extraneous issue warranting a *Fidler* hearing, see *Commonwealth* v. *Fidler*, 377 Mass. 192, 200-201 (1979), or warranting an evidentiary hearing on the new trial motion. See *Commonwealth* v. *Taylor*, 32 Mass. App. Ct. at 579. We agree with the motion judge, who was also the trial judge, and thus in the best position to assess the situation, that the incident, which he had witnessed personally, did not adversely affect the defendant's right to a fair trial or give rise to a substantial risk of a miscarriage of justice.

*Judgment affirmed.*

*Denial of motion for
new trial affirmed.*