## COMMONWEALTH *vs.* DONOVAN WALKER

Essex. November 5, 2004. - January 6, 2005.

Present: MARSHALL, C.J., GREANEY, SPINA, COWIN, & SOSMAN, JJ.

*Self-Defense. Homicide. Practice, Criminal,* Instructions to jury, Verdict, Presumptions and burden of proof, Assistance of counsel, Capital case. *Constitutional Law,* Assistance of counsel. *Words,* "Deadly force."

The defendant at a murder trial failed to demonstrate that the judge's instructions on the use of deadly force in self-defense, which did not instruct that the right to use deadly force in self-defense attaches at the point a person is put in fear of physical harm (the standard for cases involving the use of nondeadly force), set too high a threshold, where the instructions did not foreclose the possibility of a voluntary manslaughter verdict based on excessive force in self-defense [215-219]; further, the instructions did not misplace the burden of proof on the issue of self-defense [219], and the judge's use of the permissive word "justified" in the excessive force instruction (i.e., that the jury would be "justified in finding the defendant guilty of voluntary manslaughter" if the Commonwealth proved excessive force) did not relieve the Commonwealth of its burden of proof [219-220].

At a murder trial, the judge's instructions to the jury that they were required to be unanimous as to the theory or theories, if any, of a conviction of voluntary manslaughter, while inappropriate on the facts of the case, did not impermissibly shift to the defendant the burden of persuading the jury to agree on the factors mitigating murder to manslaughter and did not give rise to a substantial likelihood of a miscarriage of justice, where the jury were clearly instructed that in order to obtain a conviction of murder, the Commonwealth had to prove beyond a reasonable doubt the absence of each of the mitigating factors. [220-222]

The defendant at a murder trial failed to demonstrate that the judge's erroneous instruction on inferences gave rise to a substantial likelihood of a miscarriage of justice, or that the judge's instruction on credibility was erroneous. [222-223]

The record of an evidentiary hearing on a criminal defendant's motion for a new trial supported the trial court judge's findings that defense counsel had not rendered ineffective assistance in failing to investigate a mental health defense, where counsel had no information that suggested such a defense, and where, even if such a defense had been investigated and presented, it likely would have had an adverse impact on the defendant's claim of self-defense. [223-228]

In a murder case, this court declined to exercise its power under G. L. c. 278, § 33E, either to reduce the verdict or to grant a new trial. [229]

INDICTMENT found and returned in the Superior Court Department on December 29, 1999.

The case was tried before *Christine M. McEvoy*, J., and a motion for a new trial, filed on August 13, 2001, was heard by her.

*Ruth Greenberg* for the defendant.

*Catherine Langevin Semel*, Assistant District Attorney, for the Commonwealth.

SPINA, J. The defendant was convicted of deliberately premeditated murder. He filed a motion for a new trial alleging various errors in the judge's self-defense and other instructions, and ineffective assistance of counsel, including failure to investigate mental health defenses. After hearing, the motion was denied by the trial judge. On appeal the defendant raises the same issues contained in his motion for a new trial, the denial of which is also appealed. The defendant also seeks a reduction of the degree of guilt under G. L. c. 278, § 33E. We affirm.

The jury could have found the following facts. The defendant went to the AmVets bar in Haverhill on Thanksgiving evening, November 25, 1999. At one point he had a quiet conversation with Johnnie Powell, a woman with whom he had a dating relationship that Powell had ended several months earlier. The defendant was neither intoxicated nor upset.

Tyrone Davis, the victim, was also in the bar, drinking and mingling with other patrons. At about 12:45 A.M. Davis propositioned Powell as she walked to the bathroom. An argument ensued that quickly drew the attention of the defendant. Davis apologized to Powell several times, but she would not relent. The defendant approached and said, "Leave it alone. Let it go." Davis and the defendant began to argue, and the defendant said, "You don't want to mess with me. Somebody's going to bleed." The bartender intervened, telling the defendant to leave and directing Davis to remain inside the bar. The bartender followed the defendant outside. As the bartender was returning to the bar, he was met by Davis. The bartender told him to wait inside for a while, but Davis said, "Screw this," and pushed past him.

The defendant and Davis argued for several minutes in the

parking lot. A number of patrons, including some friends of Davis, gathered around to watch, but otherwise they did not become involved. The defendant said, "I want to get to my car. No one is pushing me there," and, "If you mess with me you'll be on the ground." The defendant did not attempt to back away or go to his car.

Davis, who was not armed, pushed the defendant backward, then said either "I'm out of here," or "Get away from me." The defendant struck Davis once on the left side of his head and once on the left side of his upper chest. Davis fell to the ground, blood gushing from the left side of his head. The defendant was seen closing a knife and quickly walking away. The victim's friends gave chase and threw bottles at the defendant.

Davis died of a stab wound to his head. A pathologist testified that a knife-like instrument perforated the left side of Davis's skull and penetrated his brain to a depth of four and one-half inches. The wound in his chest was five and one-half inches deep. Both wounds required a marked degree of force. A toxicology report indicated that Davis had a blood alcohol level of .323, and positive test results for cocaine.

The defendant fled to New York, but later arranged to turn himself in to Haverhill police in mid-December, 1999.

1. *Self-defense Instruction.*

The defendant raises three challenges to the self-defense instruction.

a. *Threshold of self-defense.* The judge instructed the jury, conformably with the Model Jury Instructions on Homicide 30, 55-58 (1999), on the use of deadly force in self-defense. The defendant had requested the instruction. On appeal he argues that the instruction set too high a threshold for his right of self-defense. In particular, he claims that the judge's failure to instruct that the right of self-defense attaches at the point a person is put in fear of physical harm, the standard for cases involving the use of nondeadly force, *Commonwealth* v. *Baseler*, 419 Mass. 500, 502-503 (1995), foreclosed the possibility of a voluntary manslaughter verdict based on excessive force in self-defense. To the extent that *Commonwealth* v. *Toon*, 55 Mass.

App. Ct. 642, 654 (2002), is to the contrary, he argues, it should be overruled.[1] We disagree.

Under the defendant's theory of self-defense, if a person were pushed and responded by killing his assailant with a knife or a gun, the right of self-defense would have attached, assuming the person used all reasonable means to avoid combat and reasonably feared being physically harmed. In such cases, he argues, the only question for the jury is whether the person used excessive force. The defendant specifically argues that a person in this situation "is entitled to self-defense, but not to deadly force in self-defense. . . . *[S]uch a killing is manslaughter, not murder, and the jury must be so instructed*" (emphasis added). The defendant's theory, which we reject, redefines self-defense and effectively eliminates murder as a possible verdict whenever a defendant responds to nondeadly force by using deadly force in self-defense. That is not the law of this Commonwealth.

"The proper standard for determining whether a defendant's particular actions were justifiably undertaken in self-defense depends on the level of force he used on his victim and the circumstances that prompted those actions." *Commonwealth* v. *Pike*, 428 Mass. 393, 395 (1998). If deadly force were used, then the deadly force standard should be applied. See *Commonwealth* v. *Houston*, 332 Mass. 687, 690 (1955) ("In order to create a right to defend oneself with a dangerous weapon likely to cause serious injury or death, it must appear that the person using the weapon had a reasonable apprehension of great bodily harm and a reasonable belief that no other means would suffice to prevent such harm"). If nondeadly force were used, the nondeadly force standard should be applied. See *Commonwealth* v. *Bastarache*, 382 Mass. 86, 105 n.15 (1980) ("reasonable

---

[1] In *Commonwealth* v. *Toon*, 55 Mass. App. Ct. 642 (2002), the same appellate counsel who appears in this case raised the same issue we now address. The Appeals Court rejected the argument, saying, "We need not linger upon the defendant's contention that once the evidence raises a reasonable doubt as to his right to use *nondeadly* force in self-defense, then the jury should determine whether his use of *deadly force* is excessive force. Such a position would change the longstanding rule in this Commonwealth that before one is entitled to an instruction on the use of *deadly* force in self-defense, the evidence must raise a reasonable doubt as to his actual and reasonable belief that he was in imminent danger of death or serious bodily harm, not as to a mere concern for personal safety." *Id.* at 654, and cases cited.

concern over one's personal safety [is] the proper standard when nondeadly force is used").

Although we have never considered the question precisely in the manner in which it is now framed, the two standards are distinct, self-contained definitions of self-defense. We need only look to cases where our courts have held that a person has no right of self-defense where deadly force is used in response to nondeadly force to understand that the two standards are mutually exclusive. See *Commonwealth* v. *Berry*, 431 Mass. 326, 335-336 & n.11 (2000); *Commonwealth* v. *Nunes*, 430 Mass. 1, 5 (1999); *Commonwealth* v. *Pike*, *supra* at 398; *Commonwealth* v. *Young*, 56 Mass. App. Ct. 60, 66 (2002); *Commonwealth* v. *Toon*, *supra*.

Contrary to the defendant's claim, the nondeadly force standard is used only where nondeadly force is used. Where the level of force cannot be determined as a matter of law, unlike here, we have held that instructions on both the use of deadly force and nondeadly force must be given. However, once the level of force used by a person is ascertained, that level of force will determine whether the deadly or nondeadly force standard will apply. For example, in *Commonwealth* v. *Noble*, 429 Mass. 44, 46-47 (1999), we said that whether a wrestling headlock was deadly or nondeadly force was a question of fact to be resolved by the jury before the appropriate self-defense standard could be applied. Implicit in the *Noble* decision is that only one or the other standard may be used. In *Commonwealth* v. *Baseler*, *supra* at 503-504, where the defendant was charged with assault and battery and assault and battery by means of a dangerous weapon, and he invoked self-defense as to both charges, we required that the jury be instructed as to both nondeadly force and deadly force. However, self-defense as to the felony charge was not to be measured by the nondeadly force standard. Only the nondeadly force standard would be applied to the charge of assault and battery, and only the deadly force standard would be applied to the charge of assault and battery by means of a dangerous weapon. The defendant cites no case where this court has held that a person who has used deadly force in self-defense is entitled to have the jury instructed that the right of self-defense attaches as soon as he was placed in fear of physical harm, the standard for cases involving nondeadly force.

There is no merit to the suggestion that the deadly force instruction foreclosed a voluntary manslaughter verdict. There are two aspects to the argument. First, the fact that Davis died did not foreclose voluntary manslaughter. The use of deadly force in the context of self-defense does not necessarily mean that someone died, and the fact of death does not imply excessive force. "Deadly force" refers to the level of force used, not the resulting injury. *Commonwealth* v. *Pike*, *supra* at 396 n.3; *Commonwealth* v. *Baseler*, *supra*. The manner in which deadly force is used, and the scope of the threat presented, are considerations for a jury when deciding whether excessive force was used. See *Commonwealth* v. *Harris*, 376 Mass. 201, 208 (1978) ("whether the [deadly] force used by the defendant was reasonable or was excessive in all the circumstances of this case" is jury question). Here, the jury were instructed, conformably with the Model Jury Instructions on Homicide, *supra* at 57, if a person is shown to have used "more force than is reasonably necessary in all of the circumstances to defend himself," then the Commonwealth would be entitled to a verdict of voluntary manslaughter. In this respect, voluntary manslaughter was not foreclosed by the fact that Davis died.

Second, to the extent that voluntary manslaughter under a theory of excessive force in self-defense becomes impossible if the Commonwealth proves that the defendant was not entitled to use deadly force, the defendant has not been deprived of anything to which he otherwise might have been entitled. Such is the law of deadly force in self-defense. The defendant would have been entitled to a self-defense instruction based on nondeadly force, but only if he had used nondeadly force. The absence of any evidence that he used nondeadly force rendered that level of self-defense and that instruction inapplicable and unavailable. These divergent results are driven by the separate and distinct types of self-defense that are determined by the type of force used.

Although a voluntary manslaughter verdict based on excessive force in self-defense would have been precluded if the Commonwealth proved that the defendant was not entitled to use deadly force, a verdict of voluntary manslaughter based on the more accommodating theories of reasonable provocation

and sudden combat would still be available. The jury were instructed, conformably with the Model Jury Instructions on Homicide, *supra* at 28-30, that if the Commonwealth failed to prove that the defendant was not reasonably provoked to act out of emotion rather than reasoned reflection, then the Commonwealth had not proved malice. There was no error.

b. Acevedo *claim.* In her self-defense instruction the judge told the jury:

> "If the Commonwealth fails to prove beyond a reasonable doubt the absence of self-defense your verdict must be not guilty. If, however, the Commonwealth does prove excessive force in an effort to defend one's self you would be justified in finding the defendant guilty of voluntary manslaughter."

The judge's instruction, as quoted, is substantially verbatim from the Model Jury Instructions on Homicide, *supra* at 30. There was no objection to the instruction, which the defendant had requested. The defendant now argues that this portion of the instruction improperly shifted the burden of proof to him, in violation of the rule of *Commonwealth* v. *Acevedo*, 427 Mass. 714, 716-717 (1998).

Contrary to the defendant's claim, the instruction did not misplace the burden of proof. Where there is evidence of self-defense, a judge must instruct the jury that the Commonwealth must prove, and the jury must find, beyond a reasonable doubt, that the defendant did not act in self-defense. See *Commonwealth* v. *Niemic*, 427 Mass. 718, 722 (1998). Here the judge's instruction was correct, and there was no burden shifting as occurred in *Commonwealth* v. *Acevedo, supra.* The judge's instruction also made it clear that if the Commonwealth proved beyond a reasonable doubt that the defendant used excessive force in self-defense, he would be guilty of voluntary manslaughter. This, too, is a correct statement of the law. *Commonwealth* v. *Niemic, supra.*

c. *Use of "justified."* The defendant next argues that the judge's use of the permissive "justified," instead of the mandatory "must" or "obligated," with respect to excessive force in the instruction quoted above in Part 1 (b), permitted the jury to

convict him of murder even if the Commonwealth had proved only manslaughter. The defendant does not explain how, in light of the strong burden of proof instruction, of which there were voluminous reminders (seventeen reminders during the murder instructions alone), the jury reasonably could understand that they could convict the defendant of murder based on the judge's use of the word "justified" in the excessive force instruction.

The judge's use of the permissive "justified" did not relieve the Commonwealth of its burden of proof. See *Commonwealth* v. *Torres*, 420 Mass. 479, 492 (1995). The Model Jury Instructions on Homicide, *supra* at 30, 33, approves the permissive "justified" when, as here, an excessive force instruction is given in conjunction with a murder instruction. The Model Jury Instructions also approves the mandatory "should," when an excessive force instruction is given in the absence of a murder instruction. *Id.* at 33.

If the word "justified" sends a mixed signal, as the defendant suggests, its effect here is the opposite of what he argues. In the context of the entire charge the jury reasonably might understand that if the Commonwealth proved voluntary manslaughter, they not only would be "justified" in finding him guilty of that offense, but also would not be required to do so and instead could find him not guilty. The instruction was given as requested, and was more favorable to the defendant than the position he takes on appeal. We think that the mandatory language should be used. We add that, immediately before giving the quoted instruction, the judge gave the instruction substituting the word "will" for the phrase containing the word "justified." There was no error.

Because we conclude that there was no error, we need not address the Commonwealth's argument that there could be no substantial likelihood of a miscarriage of justice where the defendant was not entitled to a self-defense instruction. See *Commonwealth* v. *Torres*, *supra* at 492.

2. *Specific Unanimity Instruction.*

At the defendant's request, which the Commonwealth joined, the judge instructed the jury that they must be unanimous as to the theory or theories, if any, of a conviction of voluntary manslaughter. She had instructed on all three theories of

voluntary manslaughter: (1) heat of passion on a reasonable provocation; (2) heat of passion induced by sudden combat; and (3) excessive use of force in self-defense. See Model Jury Instructions on Homicide, *supra* at 27. On appeal, the defendant argues that this instruction impermissibly shifted the burden to him to persuade the jury to agree on the evidentiary factors mitigating murder to manslaughter before the jury could return a verdict on the lesser offense based on the Commonwealth's failure of proof. He reasons that the unanimity instruction foreclosed the possibility that the jury might return a verdict of voluntary manslaughter instead of murder where they were in agreement that a mitigating circumstance was present, but disagreed as to which one, i.e., excessive force, reasonable provocation, or sudden combat.

We conclude that the instruction should not have been given. The judge based her decision to give a specific unanimity instruction on *Commonwealth* v. *Accetta,* 422 Mass. 642, 646-647 (1996), where this court said "in a case where the evidence would warrant a guilty verdict of manslaughter or some other crime on more than one theory, a guilty verdict should state[,] [when requested,] the theory on which guilt was found." That case involved voluntary and involuntary manslaughter, mutually exclusive crimes with respect to the element of intent. The instant case is concerned with different theories of voluntary manslaughter whose elements are similar and often, as here, overlapping.

The judge did not have the benefit of our decision in *Commonwealth* v. *Santos,* 440 Mass. 281, 284-290 (2003), decided more than three years after the trial in this case, where we upheld the denial of requests for specific unanimity instructions both as to liability as a principal or a joint venturer, and as to alternative theories of the "assault" element of armed robbery. We noted that the requirement of a specific unanimity instruction is not rooted in any constitutional principle, but in our common law, and "only in cases where the alternative 'theories' presented are substantively distinct or dissimilar." *Id.* at 289.

Here, the elements of the three theories of voluntary manslaughter are "closely related, and no purpose would be served by requiring the jury to dissect the evidence and agree as

to which related, or even overlapping, variant of the same element had been proved." *Id.* Each theory of voluntary manslaughter requires proof of an intentional infliction of injury on the victim. With respect to the two theories under heat of passion, the intended injury must be likely to cause death and in fact causes death. With respect to the theory of excessive force, the intended injury is death itself. Under all three theories, the defendant must have acted unlawfully. Under all three theories, the defendant's conduct must have been in response to conduct of the victim. See Model Jury Instructions on Homicide, *supra* at 28. Whether the defendant stabbed Davis because Davis reasonably provoked anger or fear in him by pushing him, or engaged him in sudden combat by pushing him, or instilled the fear of death or serious bodily harm in him by pushing him (Davis stood five feet, eleven inches tall, weighed 228 pounds and was bigger than the defendant), the jury's focus when deciding whether and under which theory manslaughter was committed would be nearly equivalent, both factually and legally. In the circumstances, a specific unanimity instruction as to the theory of voluntary manslaughter was not appropriate.

The flaw in the defendant's argument concerning the resulting substantial likelihood of a miscarriage of justice is that the jury were clearly instructed, conformably with the Model Jury Instructions on Homicide, *supra* at 27, that in order to obtain a conviction of murder, the Commonwealth must prove beyond a reasonable doubt the absence of each of the mitigating factors. The jury necessarily were satisfied that the Commonwealth met its burden of proof because they returned a guilty verdict of murder. If the jury found themselves in the circumstances posed by the defendant, they would have reported a deadlock. Thus, there could be no substantial likelihood of a miscarriage of justice.

3. *Other Instructions.*

The defendant argues that the judge's unobjected-to instruction that the jury "may draw inferences or conclusions only from facts which have been proved to you beyond a reasonable doubt" erroneously shifted the burden to him to prove beyond a reasonable doubt facts consistent with innocence. The instruction, though erroneous, unduly burdened the Commonwealth.

See *Commonwealth* v. *Lawrence*, 404 Mass. 378, 394 (1989) (subsidiary facts need only be proved by preponderance of evidence). The judge clearly and forcefully instructed the jury that the entire burden belongs to the Commonwealth, that the burden of proof never shifts to the defendant, that the defendant has no burden because he is presumed innocent, and that all presumptions of law are in favor of innocence. There was no substantial likelihood that the jury understood the defendant had to prove anything.

The defendant claims error in the judge's instruction on credibility, where she told the jury that "when you disbelieve a witness it means that you have to look elsewhere for credible evidence about the issue. It does not mean that something did not happen." The defendant argues that this instruction, operating "synergistically" with the previously discussed instruction on inferences, required him to produce evidence before the jury could conclude that the Commonwealth has failed to meet its burden of proof. There was no objection to the instruction. We have recently upheld the validity of such an instruction. See *Commonwealth* v. *Thomas*, 439 Mass. 362, 367 (2003). Viewed in the context of the entire charge, *Commonwealth* v. *Sellon*, 380 Mass. 220, 231-232 (1980), the jury reasonably could not have understood that the defendant was required to prove anything. There was no error.

4. *Effective Assistance of Counsel.*

In his motion for a new trial, the defendant asserts that counsel was ineffective for failing to investigate an insanity defense or the issue of his ability, based on mental disease or defect, deliberately to premeditate the killing, to form the requisite specific intent for malice, or to apprehend the actual level of harm posed by Davis. He presented two affidavits from trial counsel indicating that counsel was aware that the defendant had a history of alcohol abuse and drug addiction, that the defendant previously had attempted suicide for which he had been hospitalized, and that he had been discharged from the armed services for reasons related to psychiatric problems. In his affidavits, counsel indicated he had no strategic reason for not pursuing a psychiatric evaluation, and that (in retrospect) such evidence would not have harmed the defense.

The defendant also presented the affidavit of Dr. Paul A. Spiers, a forensic neuropsychologist, stating that the defendant suffered from "paranoid schizophrenia and deficits of frontal network [brain] functioning resulting in an [in]ability to resist alcohol and to foresee consequences, defects that are further compounded by the consumption of and the neurophysiological effects of alcohol," and that as a result "he was unable to premeditate murder." Dr. Spiers's affidavit further indicated that the defendant was "unable to control the impulse to respond with excessive force in self-defense, or to evaluate the level of risk presented by his [assailant]. His perception of the circumstances would also likely have been distorted by his paranoia . . . ." Dr. Spiers also stated that the defendant's "recollection of [the killing] is impaired by his documented mental disease and defect . . . [and] that such impaired recollection is characteristic of patients in the state reported to me by the defendant and of patients suffering from [defects of frontal network functioning], and was not a sham."

Defense counsel indicated in his second affidavit that had he had the benefit of Dr. Spiers's report, he "would have presented [Dr. Spiers's] testimony to support the defendant's lack of recall, his ability to give credible testimony, and the mitigation of this crime to manslaughter." He gave testimony to the same effect.

The judge conducted an evidentiary hearing on this aspect of the defendant's motion for a new trial. Trial counsel was the sole witness. The judge concluded that experienced defense counsel's pursuit of a self-defense theory was a trial strategy that was not manifestly unreasonable. She further concluded that this trial strategy was "his best theory of defense" which would have conflicted with or been severely weakened by concurrent presentation of an argument that "the defendant lacked criminal responsibility through a mental impairment." The judge implicitly rejected counsel's assertion that he would have presented a mental health defense had he had Dr. Spiers's report.

A judge's findings of fact after an evidentiary hearing on a motion for a new trial will be accepted if supported by the record. See *Commonwealth* v. *Bernier*, 359 Mass. 13, 16 (1971). The judge is the final arbiter of questions of credibility. *Id.* "A

motion for a new trial is addressed to the sound discretion of the judge, *Commonwealth* v. *Smith*, 381 Mass. 141, 142 (1980), and the judge's disposition of the motion will not be reversed unless it is manifestly unjust, *Commonwealth* v. *Little*, 384 Mass. 262, 269 (1981), [rev'd on other grounds, *Commonwealth* v. *Santos*, 402 Mass. 775, 788 (1988)]; *Commonwealth* v. *Leavitt*, 21 Mass. App. Ct. 84, 86 (1985), or unless the trial was infected with prejudicial constitutional error. *Commonwealth* v. *Stewart*, 383 Mass. 253, 257 (1981). Reversal for abuse of discretion is particularly rare where the judge acting on the motion was also the trial judge. *Commonwealth* v. *Leavitt, supra* at 85. *Commonwealth* v. *Gordon*, 13 Mass. App. Ct. 1085 (1982)." *Commonwealth* v. *Moore*, 408 Mass. 117, 125 (1990).

When reviewing claims of ineffective assistance of counsel under G. L. c. 278, § 33E, we first determine "whether there was an error in the course of the trial (by defense counsel, the prosecutor, or the judge), and, if there was, whether that error was likely to have influenced the jury's conclusion." *Commonwealth* v. *Wright*, 411 Mass. 678, 682 (1992). Claims of ineffectiveness based on tactical decisions are scrutinized under the "manifestly unreasonable" when made standard. *Commonwealth* v. *Adams*, 374 Mass. 722, 728 (1978).

The record would not support a finding of error by counsel. The standard is whether "there has been serious incompetency, inefficiency, or inattention of counsel — behavior of counsel falling measurably below that which might be expected from an ordinary fallible lawyer." *Commonwealth* v. *Satterfield*, 373 Mass. 109, 115 n.10 (1977), quoting *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974). Experienced trial counsel had no information, whether from discovery, interviews with the defendant, family members, or personnel at the house of correction where the defendant had been held for more than seven months before trial, that suggested a potential mental health defense. See *Commonwealth* v. *Doucette*, 391 Mass. 443, 458-459 (1984). Although counsel had been informed of a prior suicide attempt thirteen years earlier while the defendant was in the Navy, as well as his discharge from the Navy, neither incident suggested that the defendant was suffering from a mental illness. The naval hospital report concerning the at-

tempted suicide in 1986 indicates that the defendant abused alcohol and had problems adjusting to the restrictions of Navy life, but it also notes no evidence of a major mental illness or present suicidal ideation, and that the self-inflicted wounds were superficial. The defendant's military court martial papers indicate that he was discharged in 1987 because of unauthorized absences — not because of psychiatric reasons. Moreover, the defendant consistently presented himself to counsel as a responsible father who took care of his children and as someone who was able to hold jobs throughout his adult life, and he consistently asserted his belief that he had acted in self-defense. Based on this record, the absence of any expert testimony concerning counsel's performance, and the judge's "clear memory" that counsel's representation of the defendant was "superb," there is insufficient evidence that counsel's failure to investigate a mental health defense fell "measurably below that which might be expected from an ordinary fallible lawyer." *Commonwealth* v. *Satterfield, supra.*

Even if counsel should have investigated a mental health defense, his failure to do so did not "likely deprive[] the defendant of an otherwise available, substantial ground of defence." *Id.*, quoting *Commonwealth* v. *Saferian, supra.* Although a mental health defense and self-defense would not necessarily have been irreconcilable, the mental health defense was, in the judge's view, weak,[2] and likely would have had an adverse impact on the claim of self-defense. The record supports her.

The defendant's mental health defense depended, in part, on evidence that the defendant had consumed a substantial amount of alcohol and was unable to recall details of the incident because he experienced an alcohol blackout. There was no such evidence at trial, and counsel was aware of no evidence that contradicted the trial testimony on these points to any appreciable degree. There was evidence at trial to the contrary, indicating that the defendant had had three beers, was calm and polite, and was not intoxicated as of the time of the incident. Moreover,

---

[2]The judge noted that insanity verdicts are rare, even when, unlike here, there is strong evidence of mental illness or bizarre human conduct.

there was evidence that the defendant fled the scene and drove to New York City with no reported difficulty.

The evidence adduced at the hearing on the motion for a new trial added nothing appreciable to satisfy the defendant's burden. Trial counsel had been furnished with statements of the defendant immediately after the killing that indicate the defendant had a clear recollection of what occurred, that he had been aware of and was in control of his feelings, and that he believed he had acted in self-defense. In particular, the defendant had left a note to his former wife, a copy of which had been provided to counsel, stating, "I was not fighting over no woman. I was just trying to stop an argument and he attacked me along with his friends. I panicked and I run but now it's too late because he is dead." Trial counsel also had been furnished with a statement of a friend and former roommate of the defendant whom the defendant telephoned the morning after the killing. The defendant told his friend, "I was on my way out. The guy was going after Johnnie, man. I told him to take it easy. He pushed me, then we started fighting and I pulled out my knife and stabbed him." In addition, the defendant's narrative of the events of the evening of November 25-26, 1999, that he gave to trial counsel were detailed and consistent with the statements of the eyewitnesses. The trial testimony about the defendant's sobriety and the defendant's accounts of his actions reveal a mind that was oriented, clear, and rational.

In addition, the evidence about the defendant's history of mental health problems was scant, and his assessment of the circumstances surrounding the incident was not delusional. If Dr. Spiers had testified, his opinion would have been open to serious attack. His opinion was based on assumptions of fact about the defendant's state of sobriety, ability to recall details, and tendency to be delusional, which either had not been established or were contrary to facts that had not been disputed. If the defendant testified that he was drunk, delusional, or had blacked out, his credibility would have been seriously undermined, which likely would have detracted from any testimony he might have given on the subject of self-defense. The judge's finding that a mental health defense would have been at odds and inconsistent with the focus of self-defense, which had been

to maximize the evidence of the defendant's "legitimate" reaction to provocative or combative circumstances,[3] was supported by the record.

Trial counsel testified that, as a general rule, he tries to select the best and most direct theory of defense and present it at every stage of the proceedings. He explained that, based on his experience (which is substantial), to do otherwise diminishes the credibility of the defense and of the lawyer presenting the defense. This is a well-known and time-honored approach. The judge found that counsel did select the best theory of defense. She also found that his trial strategy of pursuing one defense was not manifestly unreasonable, especially where the mental health defense would have "severely weakened" the defense of self-defense. Cf. *Commonwealth* v. *Doucette, supra* at 458 (counsel's failure to request instruction on voluntary consumption of alcohol and drugs may have been reasonable trial tactic where it would have tended to undermine his claim that he acted in self-defense). The denial of the motion for a new trial as to this claim of ineffective assistance of counsel was not an abuse of discretion. See *Commonwealth* v. *Wright, supra* at 683.

Finally, the defendant alleges ineffective assistance of counsel by virtue of the failure of counsel to argue at the time of sentencing, or in a motion under Mass. R. Crim. P. 25 (b) (2), 378 Mass. 896 (1979), that a reduction of the verdict was consonant with the interest of justice. We need not dwell on this point because appellate counsel made the argument in her motion for a new trial, and it has been made directly to us. The defendant suffered no lost opportunity because the issue has been fully presented, and he suffered no harm because the motion was denied. Presumably, it would have been denied even if trial counsel had filed the motion. We are aware that in most cases such a motion is filed by appellate counsel, and therefore we are not inclined to view this as a "failure" of trial counsel.

---

[3]Trial counsel testified that his goal was to create the impression that Davis and his friends considerably outnumbered the defendant, and that they were "a bunch of drunk, hard head, hot headed people who perhaps had a racial bias," and that they chased the defendant and threw beer bottles at him as he drove away. In contrast, he tried to present the defendant as "a good and responsible father who took care of his children" and was consistently employed.

5. *Relief under G. L. c. 278, § 33E.*

The defendant asks us to reduce the verdict. We have read the briefs and the record, and heard oral argument. We perceive no cumulative effect of any errors that warrants a reduction of the verdict or the grant of a new trial, as argued by the defendant in his brief. We have considered the defendant's personal background, his history of peaceful behavior, his hard work to support his children, and his efforts to help others, especially his work as an aide to the elderly. We also have considered his lack of a criminal record. However, the question of self-defense was fully aired at the trial and we see no reason to disturb the verdict or grant a new trial. The incident began as an argument that did not even involve the defendant, and the evidence indicates that Davis had apologized several times to Powell but she would not accept his apologies. The record also supports a finding that the defendant was prepared to use deadly force regardless of the level of force Davis may have used. We are satisfied that the jury's verdict was just.

*Judgment affirmed.*

*Order denying motion for a new trial affirmed.*