NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

20-P-1055

COMMONWEALTH

vs.

RICHARD DAVIS.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

A jury convicted the defendant of second-degree murder on an indictment charging him with murder in the first degree. The victim, Kevin Crowley, and the defendant were friends and lived next door to each other in a rooming house located in Lynn. There was no dispute that Crowley died from a single stab wound to his chest inflicted by the defendant. The defendant admitted that he stabbed Crowley, and most of the tragic episode was recorded by a video surveillance camera located in the hallway outside Crowley's door. The central issue at trial was the degree of the defendant's criminal responsibility. The judge instructed the jury on the elements of murder in the first and second degrees, and voluntary manslaughter based on reasonable

provocation, but he declined to give an instruction on self-defense or voluntary manslaughter based on use of excessive force in self-defense as the defendant had requested. On appeal, the defendant argues that the judge erred by not giving the requested instructions, failing to give a humane practice instruction, limiting the scope of defense counsel's redirect examination of him, and making comments that allegedly disparaged defense counsel in front of the jury. We affirm.

Background. The defendant and Crowley lived in adjacent rooms on the second floor of a three-story, single occupancy rooming house. Crowley lived in room fifteen, the defendant in room sixteen. They sometimes watched television in the defendant's room with other neighbors and were often joined by Roberto Alfonso, who lived on the first floor and was the building's manager. Crowley's room was located between the defendant's room and the main stairway that led downstairs to the front entrance. Both rooms had dead bolt locks that locked from the inside and could only be opened with a key. Crowley's door also had a peephole. The defendant had done some renovation work in the building and was familiar with its layout and construction. He testified that the doors were flimsy, and the walls were thin, such that any banging or yelling would travel from one room to the next. The defendant was also acquainted with the building's video surveillance system that

2

included motion-activated cameras that recorded activity, but not sound, in the common areas and outside.  As noted above, one camera was located just outside of Crowley's door and video footage from that camera and others was admitted in evidence.

The day of the murder, August 6, 2017, was a Sunday.  The defendant's daughter, Lisa Hagan,[1] lived close by and regularly hosted her father and friends for an early dinner on Sunday afternoons.  That Sunday was no exception.  Shortly after 12 P.M., Alfonso drove Crowley and the defendant to Hagan's house.  They stopped to purchase alcohol on the way and there is no dispute that Crowley became inebriated as the afternoon progressed.  Crowley also became belligerent and was particularly bothered by a comment the defendant made about his reaction when Hagan's dog vomited.  Alfonso and Crowley saw the dog get sick and almost became sick themselves.  The defendant, Alfonso, and Crowley were all military veterans.  Alfonso and Crowley's queasiness prompted the defendant to say:  "You big war heroes can't even take a little dog barf."  Crowley was offended by the comment and became angry.  Alfonso testified that Crowley "never" calmed down.  As Crowley's attitude toward the defendant worsened, the defendant became scared.  At dinner, Crowley approached the defendant from behind and muttered

---

[1] Or Hagen; the name appears both ways in the record.

3

threats under his breath in the defendant's ear.  At some point, the defendant told Crowley that he did not want him coming back to his room when they returned home.  Later, during the car ride back to the rooming house, Crowley continued to yell at and threaten the defendant.

When the group arrived home, the defendant told Alfonso that he did not want Crowley in his room because he was being "aggressive."  Alfonso replied that he would come upstairs after he used the bathroom.  Crowley and the defendant continued upstairs to their respective rooms with the defendant walking behind Crowley.  The defendant testified that Crowley kept screaming at him and said he would "fuck [him] up."

The defendant entered his room and locked his door but remained worried and fearful that Crowley would come through the door forcibly.  The defendant testified that he could hear Crowley continuing to yell and threaten him from his room and bang on the wall.  According to the defendant, Crowley said: "I'm going to stay home from work, you know, just so we can talk about this."  Approximately thirty seconds later, Crowley left his room, stood in front of the defendant's door, and tried to turn the door handle.  The camera recorded Crowley's actions. He then walked down the hallway briefly, returned to the defendant's door where he appears on the video to be yelling, and then reentered his room.

4

About two minutes later, the camera recorded the defendant exiting his room with a large knife in his hand. The defendant knocked on Crowley's door and then took a step back into the hallway. When Crowley opened the door, the defendant immediately stepped forward quickly and stabbed Crowley in the chest. Crowley fell backward, the defendant yelled "Leave me the fuck alone," and then the defendant returned to his room. A minute later, the defendant knocked on Crowley's door and shouted at him again, but Crowley did not respond.[2] The defendant returned to his room for another two minutes or so and then went to get Alfonso. The defendant told Alfonso: "I believe I killed Kevin." Alfonso immediately went upstairs to check on Crowley. The door was unlocked. Alfonso entered the room, saw Crowley on the floor bleeding and "gasping for air," and called the police. He then told the defendant to go to his room and wait.

When the police and emergency medical technicians arrived, Crowley was not breathing and had no pulse. He was pronounced dead at the hospital. One of the responding officers, Christopher Hagerty, interviewed the defendant in his room. The defendant testified that he did not remember much about the conversation other than asking about Crowley's condition because

---

[2] The record does not reveal how the door to Crowley's room shut.

he was worried that he had "seriously hurt him." At trial, Officer Hagerty testified that the defendant "was loud, but he wasn't yelling." He also described the defendant as "in a state."[3]

The defendant provided additional details about his relationship with Crowley and the events that led to the stabbing during his testimony. According to the defendant, he became afraid of Crowley within one month after Crowley moved into the room next door. At one point, the defendant testified, Crowley had grabbed him by the neck and slammed him into a door. Crowley generally became aggressive when he drank alcohol and, on that particular day, the defendant felt uncomfortable and scared of Crowley. On their return to the rooming house, the defendant kept his distance from Crowley, and when he went to his room he was nervous, but he believed he was sufficiently safe. He explained that even if he thought otherwise and had decided to leave, Crowley would have seen him through the peephole of his door. The defendant also testified that calling the police would not have been helpful; rather it would have just made Crowley mad. The defendant asserted that he had no

---

[3] Based on a prior ruling on the parties' motions in limine, which is not challenged on appeal, Hagerty's testimony was limited to his observations, including seeing the knife used in the murder on the table inside of the defendant's room. He did not testify about any statements made by the defendant.

intention of killing Crowley.  He was just in such a state of shock and fear that he needed to do something.

Discussion.  1.  Self-defense instructions.  The defendant argues that the judge abused his discretion by refusing to submit the case to the jury on theories of self-defense and the use of excessive force in self-defense.  It is well settled that a judge must instruct on self-defense if the evidence, taken in the light most favorable to the defendant, was sufficient to raise a reasonable doubt on the issue.  See Commonwealth v. Pike, 428 Mass. 393, 395 (1998).  "Whether the evidence is sufficient to reach this threshold is often a complex determination[,] and . . . a trial judge should err on the side of caution in determining that self-defense has been raised sufficiently to warrant an instruction" (quotations and citation omitted).  Commonwealth v. Ramos, 66 Mass. App. Ct. 548, 554 (2006).  Where, as here, the defendant has testified, "no matter how incredible his testimony, that testimony must be treated as true."  Pike, supra.

Viewing the evidence in the light most favorable to the defendant, and accepting his testimony as true, there was no basis on which the defendant was entitled to an instruction on self-defense or use of excessive force in the exercise of self-defense.  Our case law instructs that in order to properly invoke the right to use self-defense "[t]here must be evidence

7

warranting at least a reasonable doubt that the defendant: (1) had reasonable ground to believe and actually did believe that he was in imminent danger of death or serious bodily harm, from which he could save himself only by using deadly force, (2) had availed himself of all proper means to avoid physical combat before resorting to the use of deadly force, and (3) used no more force than was reasonably necessary in all the circumstances of the case." Commonwealth v. Harrington, 379 Mass. 446, 450 (1980).

Here, the defendant's testimony established only that he was scared, and not that he had a reasonable ground to believe or did believe he was in imminent danger of death or serious bodily harm. To be sure, the defendant testified that he feared Crowley could come through his door and harm him, but the defendant's subjective fear of harm must be objectively reasonable and here it was not. Despite his fear, the defendant was not in imminent danger of death or serious bodily harm when he was behind his locked door. The defendant himself acknowledged that he could have called for help at that point, but he decided not to do so. As he explained, in his view, calling the police would have made things worse. The defendant believed that the police "would have told [Crowley] to go to his room, [the police] would have told me to go in my room and that would have made the situation worse." Even assuming that the

8

defendant's failure to seek assistance was somehow legitimate, we cannot ignore the facts that while Crowley was verbally aggressive -- and threatened to physically harm the defendant -- Crowley was unarmed, and the defendant was the first aggressor. The video footage was, in essence, a silent movie that unequivocally demonstrated this to be so.

Given our conclusion that there was insufficient evidence to support a reasonable doubt that the defendant had a reasonable ground to believe that he was in imminent danger of death or serious bodily harm, we need not address the remaining two factors. That said, it is evident that should we do so, the defendant fares no better. Armed with a knife, the defendant opened his door, knocked on Crowley's door, and then attacked him. Even if the defendant believed that he was not safe in his room, a staircase to safety was to the right of Crowley's door. Furthermore, the defendant's testimony that he feared Crowley would see him pass by the door through the peephole, even viewed in the light most favorable to him, does not change the fact that the defendant failed to avail himself of all proper means to avoid physical combat before resorting to the use of deadly force. With regard to the amount of force, we do not question the defendant's testimony that he only "intended" to scare Crowley, but the fact remains -- he did not simply brandish the knife, he plunged it into Crowley's chest.

9

Lastly, because the defendant was not entitled to a self-defense instruction at all, he was not entitled to an instruction on the use of excessive force in self-defense. Commonwealth v. Toon, 55 Mass. App. Ct. 642, 643 (2002).

2. Humane practice instruction. The defendant argues that voluntariness was a live issue at trial, and therefore, the judge was required sua sponte to give a humane practice instruction. We do not agree.

Prior to trial, the defendant filed a motion to suppress the statements he made to the police at the scene in part based on the ground that the statements were involuntary due to his agitated state. That motion was denied. At trial, defense counsel did not argue that the defendant's admissions to police were not voluntarily made. Nor did the defendant ever request a humane practice instruction.[4]

As we recently explained in Commonwealth v. Tillson, 104 Mass. App. Ct. 180, 194 (2024), quoting Commonwealth v. Bohigian, 486 Mass. 209, 219-220 (2020), "If the defendant does not raise the issue of voluntariness, the judge has a sua sponte obligation to conduct a voir dire only if the voluntariness of the statements is a live issue such that there is evidence of a

---

[4] The instruction was included in an initial submission of requests for jury instructions but was not requested at the charge conference, nor was there an objection to the absence of an instruction.

10

substantial claim of involuntariness."  There is no bright-line test to determine whether voluntariness was a live issue at trial.  However, for voluntariness to be considered a "live issue," "substantial evidence of involuntariness [must be] produced."  Commonwealth v. Gallett, 481 Mass. 662, 686 (2019), quoting Commonwealth v. Kirwan, 448 Mass. 304, 318 (2007).  Here, the defendant argues that the filing of his motion to suppress and his motion in limine to preclude hearsay statements made to the officers were sufficient to make voluntariness a "live issue."  He also points to testimony provided by Officer Hagerty that confirmed he was agitated and upset to support his position.

Although the issue was not raised by defense counsel, the judge was aware of it and addressed it.  Before cross-examination of the defendant commenced, the judge inquired of the prosecutor whether she intended to introduce the defendant's statements to police immediately after the stabbing.  The prosecutor responded:  "Well, I wanted to hear what the defendant . . . had to say during direct examination, but it's something that I would get into on my cross examination."  The judge then correctly noted that under the case law if there was evidence that the defendant's statements were not voluntary, he was required to give a humane practice instruction and submit the question of voluntariness to the jury.  Although, after

11

reviewing the transcript and the ruling by a different judge on the defendant's pretrial motion to suppress the statements the judge made a preliminary decision that there was no substantial evidence of involuntariness, the judge made clear that he would give a humane practice instruction if those statements were admitted in evidence.

As it turned out, the prosecutor solicited only one statement during her cross-examination.  She asked:

Q.:  "Do you recall telling him that Kevin threw a punch at you and he grazed your face?"

A.:  "That was I was talking about two weeks before."

Q.:  "So, you remember some of what you told Officer Hagerty?"

A.:  "I don't remember everything at -- at that point.  You know, I was sitting there and I was nervous.  I was scared. I don't recall everything that was said between me and the officer."

Q.:  "Do you remember saying that after Kevin threw the punch at you and grazed your face that's when you went into the hallway when Kevin came at you?"

A.:  "No."

The exchange transcribed above does not provide a sufficient basis for concluding that the judge should have given a humane practice instruction.  First, the defendant neither objected nor requested that a humane practice instruction be given in response to this testimony.  Second, "emotional upset alone does not render" a statement involuntary in the absence of

12

evidence that the defendant was acting irrationally. Commonwealth v. Auclair, 444 Mass. 348, 355 (2005). In any event, if there was error, there was no substantial risk of a miscarriage of justice. See Commonwealth v. Richards, 485 Mass. 896, 914 (2020) (applying substantial likelihood standard).

To begin with, the evidence of involuntariness was not of the type or magnitude that our cases have found results in a substantial risk of a miscarriage of justice from the absence of a humane practice instruction. See Bohigian, 486 Mass. at 220 (2020) (defendant arguably "wasn't fine" during questioning where he had a visible head injury and showed signs of head trauma). Nor is this a case involving coercive questioning or force. Instead, the claim of involuntariness rests on the notion that the defendant was upset on learning that he had killed Crowley. Given these circumstances, we conclude that there is no serious risk that the jury, had it received a humane practice instruction, "would have concluded that the Commonwealth failed to meet its burden of proving that the defendant's statements to police were voluntary and therefore disregarded them." Richards, 485 Mass. at 914.[5]

---

[5] Given our conclusion, there is no basis for the defendant's claim that counsel was ineffective for not requesting an instruction. See Commonwealth v. LaCava, 438 Mass. 708, 719-720 (2003).

3. Redirect examination of the defendant. "The scope of redirect examination is within the sound discretion of the trial judge. 'A defendant who claims, on appeal, an abuse of discretion, assumes a heavy burden'" (citation omitted). Commonwealth v. Arriaga, 438 Mass. 556, 577 (2003). The defendant has not met his burden here.

During his direct testimony, the defendant testified at length about his reaction to Crowley's aggressive and threatening behavior and explained that he was nervous and scared when he approached Crowley's door with the knife. He also believed that calling for assistance would not have been helpful. Thereafter, during cross-examination, the prosecutor posed a series of questions about the options available to the defendant when he left his room and approached Crowley's door. Specifically, she asked whether the defendant was a runner and whether he could have made it past Crowley's door "quite quickly." The defendant responded: "Yes."

On redirect examination, defense counsel asked additional questions regarding the defendant's ability to pass by Crowley's door and run down the stairs safely. Specifically, she asked: (1) "Are you a runner?" and (2) "how old are you, sir?" These questions were answered. However, the Commonwealth objected when defense counsel asked: (1) "What were you scared that Kevin was going to do?" and (2) "When Kevin knocked and tried

14

the handle and walked away, . . . what was your feeling, at that point, about whether he would or would not go away and stay away."  The objections were sustained.  At sidebar, the judge explained his rulings as follows:

> "you've gone over all of that in your direct, how he felt when all those things happened. . . .  I didn't catch anything that was clearly inquired in cross examination that you were asking about.  You asked a bunch of questions that were clearly not a part of cross examination, if I missed on one of them I mean I'd like to know, but I was trying to enforce a scope objection.  That's what I was trying to do."

There was no abuse of discretion.  Contrary to the defendant's assertion, the questions to which objections were sustained were beyond the scope of the topics covered during cross-examination.  Those topics focused on what the defendant could have done instead and were not aimed at soliciting testimony about the defendant's reasons for his actions.  Moreover, as the judge observed, the defendant had already addressed these issues during his direct examination.  As a result, we are not persuaded by the defendant's argument that the questions he was not allowed to ask fell within the scope of cross-examination.

Nor are we persuaded, as the defendant asserts, that defense counsel was foreclosed from rehabilitating the defendant's credibility on "the decisive issues in the case."  We acknowledge that one essential purpose of redirect

15

examination is to give a witness an opportunity to explain or correct testimony solicited during cross-examination. Here, however, the defendant had little, if anything, to correct. As the judge noted, the defendant had already testified about the reasons for his actions during his direct examination. Furthermore, as described above, defense counsel was permitted, over the Commonwealth's objection, to ask the defendant about his perceptions regarding any avenues of escape and opportunities to seek intervention from others.

4. <u>Judge's comment to the jury</u>. After sustaining the prosecutor's objections to defense counsel's questions as described above, the judge explained his ruling to the jury as follows:

> "Let me explain to the jury. We generally, as you've seen, have two rounds of questioning, direct examination, cross examination and then if there's a desire to do so the calling attorney, whoever called the witness, gets redirect examination. But redirect examination is limited to the subjects and to clarify or questioning about [<u>sic</u>] what was brought out in cross examination. In redirect you can't go back and do what you've done on direct examination. The same is true for recross examination, you don't go back to get -- a lawyer doesn't get to go back and kind of fix things or deal with things or address things a second or maybe a first time that weren't addressed, but could have been addressed there in the earlier inquiry. So, the last round, redirect and recross, is very limited and it's limited by what was brought out in either cross examination or in the other way around in the redirects then the attorney could bring -- could talk about those things."

The defendant did not lodge an objection to any portion of the judge's explanation. He now challenges the statement: "a

16

lawyer doesn't get to go back and kind of fix things or deal with things or address things . . . that weren't addressed, but could have been addressed . . . in the earlier inquiry" and claims that it disparaged defense counsel. According to the defendant, the jury could only have understood the comment to mean that, in the judge's view, there was something wrong or missing from the defendant's case. We disagree.

The comment, read in context, was not as pointed as the defendant claims. Nor was it similar to the comments made by the trial judge in Commonwealth v. Sneed, 376 Mass. 867, 869 (1978), on which the defendant relies. In that case, the trial judge was admonished for his inappropriate intervention during the questioning of a critical defense witness. The judge asked the witness why she had not come forward earlier and threatened her with perjury. The judge also belittled the defendant's right to remain silent. Nothing of the sort occurred here.

We also reject the defendant's argument that the additional comments to defense counsel regarding the improper use of leading questions and the proper manner in which a witness could be impeached, when taken together with the judge's explanation about objections quoted above, undermined his right to a fair trial. We have reviewed the entire transcript carefully and conclude that the judge acted fairly and without partisanship throughout the proceedings. In sum, we discern no error, let

17

alone one that created a substantial risk of a miscarriage of justice, in the manner in which the judge conducted the trial.

<u>Judgment affirmed</u>.

By the Court (Vuono, Rubin & Smyth, JJ.[6]),

Clerk

Entered: August 21, 2024.

---

[6] The panelists are listed in order of seniority.